PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3047
_____

NADINE PELLEGRINO;
HARRY WALDMAN,

Appellants

v.

UNITED STATES OF AMERICA TRANSPORTATION
SECURITY ADMINISTRATION,
Div. of Dept. of Homeland Security;
TSA TSO NUYRIAH ABDUL-MALIK,
Sued in her individual capacity;
TSA TSO DENICE KISSINGER,
Sued in her individual capacity;
JOHN/JANE DOE TSA Aviations Security Inspector
Defendants sued in their individual capacities;
JOHN/JANE DOE TSA, Official Defendants,
sued in their individual capacities
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-09-cv-05505)
District Judge: Honorable J. Curtis Joyner

_____

Argued before original panel on October 3, 2017
Petition for Rehearing En Banc granted on October 3, 2018
Argued En Banc on February 20, 2019

_____

Before: SMITH, Chief Judge, McKEE, AMBRO,
CHAGARES, JORDAN, HARDIMAN, GREENAWAY, JR.,
SHWARTZ, KRAUSE, RESTREPO,
BIBAS, PORTER and SCIRICA, Circuit Judges

(Opinion filed August 30, 2019)

Paul M. Thompson (Argued)
Sarah Hogarth
McDermott Will & Emery
500 North Capitol Street, N.W.
Washington, DC  20001

Matthew L. Knowles
McDermott Will & Emery
28 State Street, Suite 3400
Boston, MA  02109

        Counsel for Appellants

Mark J. Sherer (Argued)
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106

Counsel for Appellees

Jonathan H. Feinberg
David Rudovsky
Kairys Rudovsky Messing & Feinberg
718 Arch Street, Suite 501 South
Philadelphia, PA  19106

Hugh Handeyside
Hina Shamsi
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY  10004

Molly M. Tack-Hooper
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA  19106

Counsel for Amicus Appellants
American Civil Liberties Union;
American Civil Liberties Union of Pennsylvania;
Cato Institute; Rutherford Institute.

Mahesha P. Subbaraman
222 South 9th Street, Suite 1600
Minneapolis, MN  55402

Counsel for Amicus Appellants
Freedom to Travel USA; Restore the Fourth Inc.

## OPINION OF THE COURT

AMBRO, *Circuit Judge*, with whom Chief Judge Smith and Judges McKee, Chagares, Greenaway, Jr., Shwartz, Restrepo, Bibas, and Porter join.

The Federal Government is typically immune from suit. The Federal Tort Claims Act waives the Government's immunity for certain torts committed by its employees. 28 U.S.C. § 2680(h) does so for specific intentional torts committed by "investigative or law enforcement officers," which it defines as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." If a federal official fits this definition, plaintiffs may sue for certain intentional torts.

Nadine Pellegrino relies on § 2680(h), which we also refer to as the "proviso," to recover against Transportation Security Officers (TSOs) at the Philadelphia International Airport who allegedly detained her, damaged her property, and fabricated charges against her. The District Court dismissed her case on the ground that TSOs are not "officer[s] of the United States" who "execute searches . . . for violations of Federal law." The underlying theme was that the subsection's waiver of immunity covers only criminal law enforcement officers, and TSOs, though nominally officers, are nothing more than screeners who perform routine, administrative inspections of passengers and property on commercial aircraft.

4

We disagree. The words of the proviso dictate the result here. Because TSOs are "officer[s] of the United States" empowered to "execute searches" for "violations of Federal law," Pellegrino's lawsuit may proceed.

## Background

### A. *Factual Background*

Pellegrino and her husband arrived at the Philadelphia International Airport to board a flight home to Florida. This meant passing through the security checkpoint maintained by the Transportation Security Administration (TSA) with TSOs. Congress created the TSA after the terrorist attacks of September 11, 2001, with the enactment of the Aviation and Transportation Security Act, Pub. L. No. 107-71, 115 Stat. 597 (2001). Under that Act, TSOs perform screenings at TSA checkpoints in airports in the United States. *See* 49 U.S.C. § 44901(a).

As Pellegrino passed through the security checkpoint, she was randomly selected for additional screening. A TSO began examining her bags, but she stopped him and requested a more discreet screening. In a private room, several TSOs combed through Pellegrino's luggage, papers, and other effects. One allegedly counted her coins and currency, examined her cell phone data, read the front and back of her membership and credit cards, and opened and smelled her cosmetics, mints, and hand sanitizer. Per Pellegrino, the TSO also spilled the contents of several containers and was so rough with her belongings that her jewelry and eyeglasses were damaged. Frustrated, she told the TSOs that she would report their conduct to a supervisor.

The screening ended, but the TSOs' alleged torment did not. Pellegrino was left to clean up the mess created by

5

the search, a task that took several trips to and from the screening room. As she was repacking her first bag, one of the TSOs claimed that Pellegrino struck her with it. On a trip to retrieve another bag, another TSO allegedly blocked Pellegrino's access to it, forcing her to crawl under a table to reach it. When she did so, the table tipped over, and the TSO claimed Pellegrino struck her in the leg while she was collecting the bag. Pellegrino denies striking either TSO and alleges she heard both say to one another, "[Y]ou saw her hit me, didn't you?"

As a result of the TSOs' allegations, the Philadelphia District Attorney's Office charged Pellegrino with ten crimes, including aggravated assault, possession of an instrument of a crime (her luggage), and making terroristic threats. At a preliminary hearing, the presiding judge dismissed many of the charges and the District Attorney abandoned others. The remaining charges came to naught when the TSA failed to produce surveillance video from the incident, one TSO failed to appear in court, and another TSO's testimony was self-contradictory on key points.

## B. Procedural History

After her ordeal at the airport and victory in the courtroom, Pellegrino and her husband brought numerous constitutional and statutory claims (including under the Administrative Procedure Act and the Freedom of Information Act) against the TSA and several TSOs. The District Court winnowed them down to claims for property damage, false arrest, false imprisonment, and malicious prosecution under the Tort Claims Act and implied rights of action under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), for malicious prosecution in violation of the First and Fourth Amendments. The claim for property damage

6

settled, and the Court granted summary judgment on the *Bivens* claims.

As for the claims under the Tort Claims Act for false arrest, false imprisonment, and malicious prosecution, the Court granted summary judgment for the defendants on the ground that TSOs are not "investigative or law enforcement officer[s]" whose intentional torts expose the United States to liability. *See Pellegrino v. U.S. Transp. Sec. Admin.*, No. 09-cv-5505, 2014 WL 1489939, at *7 (E.D. Pa. Apr. 16, 2014). In particular, the Court stated that it was "ambiguous" whether TSOs perform the requisite "searches . . . for violations of Federal law," *id.* at *5, and turned to the legislative history of the proviso at 28 U.S.C. § 2680(h) to rule in favor of the Government, *id.* at *6–7.

On appeal we appointed *amicus* counsel to argue Pellegrino's side on, *inter alia*, the Tort Claims Act issue. A divided panel of our Court affirmed the District Court in full (including as to summary judgment on the non–Tort Claims Act claims). *See Pellegrino v. U.S. Transp. Sec. Admin.*, 896 F.3d 207, 209 (3d Cir. 2018). We then granted rehearing *en banc* to consider whether TSOs are "investigative or law enforcement officer[s]" as defined in the Tort Claims Act.

## Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. §§ 1346(b) and 1331. We have jurisdiction per 28 U.S.C. § 1291, and we review anew the District Court's interpretation of the Tort Claims Act. *See Baer v. United States*, 722 F.3d 168, 172 (3d Cir. 2013).

## Analysis

As noted, the United States enjoys baseline immunity from suit. *See Millbrook v. United States*, 569 U.S. 50, 51–52 (2013). Congress has overridden this rule with the Tort Claims Act's general waiver of immunity for injuries "caused by . . . any employee of the Government." *See* 28 U.S.C. § 1346(b)(1). The waiver of immunity does not extend to several circumstances noted in 28 U.S.C. § 2680, including the subsection pertinent here; hence the Government's immunity is reclaimed as to eleven intentional torts laid out in the so-called intentional-tort exception at § 2680(h). Those eleven are "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, [and] interference with contract rights." *Id.* § 2680(h).

But even the intentional-tort exception has its limits. Under the proviso, the exception does not apply to (and thus the United States may still be sued for) six of the eleven torts — "assault, battery, false imprisonment, false arrest, abuse of process, [and] malicious prosecution" — committed by "investigative or law enforcement officers." *Id.* "For the purpose of this subsection, 'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* The question for us is whether TSOs fit this definition.

### A. *Text of the Proviso, 28 U.S.C. § 2680(h)*

Are TSOs (1) "officer[s] of the United States" who are (2) "empowered by law" to (3) "execute searches" for (4) "violations of Federal law"? To begin, we track the text.

8

### 1. *"Any Officer of the United States . . ."*

"Ordinarily, a word's usage accords with its dictionary definition." *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015). Under one prominent dictionary definition shortly before 1974, the year of the proviso's enactment, an officer "serve[s] in a position of trust" or "authority," especially as "provided for by law." *Officer*, Webster's Third New International Dictionary (1971); *see also Officer*, Black's Law Dictionary (4th ed. rev. 1968) ("[A]n officer is one holding a position of trust and authority . . . ."). TSOs satisfy this definition, as they are "tasked with assisting in a critical aspect of national security — securing our nation's airports and air traffic." *Vanderklok v. United States*, 868 F.3d 189, 207 (3d Cir. 2017). To take another definition from the time, officers are "charged" by the Government "with the power and duty of exercising certain functions . . . to be exercised for the public benefit." *Officer*, Black's Law Dictionary, *supra*. TSOs qualify under this definition as well, as they perform "the screening of all passengers and property," 49 U.S.C. § 44901(a), to protect travelers from hijackings, acts of terror, and other threats to public safety. For good reason, the role is Transportation Security *Officer*, and TSOs wear uniforms with badges that prominently display the title "Officer."[1] Hence they are "officer[s]" under the proviso.

---

[1] The title "officer" was adopted by the TSA in 2005, with the uniforms and "officer" badges added in 2008. *See* Press Release, Transp. Sec. Admin., *Transportation Security Officers Have Renewed Focus and New Look on Seventh Anniversary of 9/11* (Sept. 11, 2008), https://www.tsa.gov/news/releases/2008/09/11/transportation-security-officers-have-renewed-focus-and-new-look-seventh. Interestingly, a bill was introduced in 2011 that would have

If TSOs are officers by name, wear uniforms with badges noting that title, and serve in positions of trust and authority, what is the textual argument to rebut the straightforward conclusion that they are "officer[s] of the United States" under the proviso?  It would be that the Aviation Security Act creates the position of "law enforcement officer," 49 U.S.C. § 114(p)(1), one who carries a firearm and can make arrests for criminal law violations, *id.* § 114(p)(2), while designating TSOs as "employee[s]," *id.* § 44901(a).  This latter provision of the Aviation Security Act borrows from the general civil-service statute for who is an "employee."  That general provision is 5 U.S.C. § 2105, which in turn defines "employee" to include "officer[s]" in § 2105(a).  "Officer" is further defined as an individual "appointed in the civil service by," among others, "the head of an Executive agency."  *Id.* § 2104(a)(1).  But TSOs are not appointed by the head of an Executive agency.  Rather, they are appointed by the TSA Administrator, formerly known as the Under Secretary of Transportation for Security.  *See* 49 U.S.C. § 44935 (1994), *amended by* FAA Reauthorization Act of 2018, Pub. L. No. 115-254, 132 Stat. 3186 (2018).  This official leads the TSA, *see* 49 U.S.C. § 114(b), but is not the head of an Executive agency.  Thus TSOs technically are not "officers" under the Aviation Security Act.

But are they "officer[s]" under the Tort Claims Act?  A distinction between "employee[s]" and "officer[s]" appears

stripped TSOs of the title "officer" and of the "officer" badge.  *See* Stop TSA's Reach In Policy Act, H.R. 3608, 112th Cong. (2011), https://www.congress.gov/bill/112th-congress/house-bill/3608/text (to be known, were it passed, as the STRIP Act).  It went nowhere.  Thus what we know is that Congress knew of the "officer" designation and decided to do nothing to counter it.

in that Act, which (as noted) waives sovereign immunity for the torts of an "employee," *see* 28 U.S.C. § 1346(b), but applies § 2680(h)'s waiver only to "officer[s]," *id.* § 2680(h). Because TSOs fall on the "employee" side of the line in the Aviation Security Act, do they as well in the Tort Claims Act?

We think not.[2] Aside from the single shared word "officer," there is no textual indication that only a specialized "law enforcement officer" in the Aviation Security Act, 49 U.S.C. § 114(p), qualifies as an "officer of the United States" under the proviso in the Tort Claims Act.

And neither Act's statutory distinction between "officer[s]" and "employee[s]" is airtight. Instead, both statutes include "officers" within the meaning of the term "employee." *See* 28 U.S.C. § 2671 (providing in the Tort Claims Act that "[e]mployee of the Government" includes "officers or employees of any federal agency"); 49 U.S.C. § 44901(a) (providing in the Aviation Security Act that "employee" is defined by 5 U.S.C. § 2105, which in turn defines "employee" to include "officer"). We are hesitant to put too much stock into a distinction between two terms that are not themselves mutually exclusive. *See also* 49 U.S.C. § 44922(e) (providing that "[a] State or local law enforcement *officer* who is deputized" into federal service by the TSA Administrator "shall be treated as an '*employee* of the Government'" for purposes of the proviso) (emphases added).

---

[2] One Circuit has answered yes, *see Corbett v. Transp. Sec. Admin.*, 568 F. App'x 690, 701 (11th Cir. 2014) (*per curiam*), but it did so in an unpublished, *per curiam* opinion that is not binding in that Circuit, *see* 11th Cir. R. 36-2, I.O.P. 7.

11

Moreover, grafting the Aviation Security Act's definitions of "employee" and "officer" onto the Tort Claims Act yields a result inconsistent with case law, which includes non-officers in the general civil-service laws as "investigative or law enforcement officers" under the Tort Claims Act's proviso. *See, e.g.*, *Caban v. United States*, 671 F.2d 1230, 1234 (2d Cir. 1982) (immigration agents); *Moore v. United States*, 213 F.3d 705, 708 (D.C. Cir. 2000) (postal inspectors). Because the definitions of "officer" and "employee" in 5 U.S.C. §§ 2104 and 2105 are underinclusive as applied to the proviso, we are reluctant to depend on them for our reading of "officer of the United States." *See also* Jack Boger et al., *The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis*, 54 N.C. L. Rev. 497, 519 & n.103 (1976) (arguing that the limitation to "any officer of the United States" in the newly enacted proviso was "apparently" not meant to import the "[w]ell-established . . . statutory . . . distinction[]" between "officers" and "employees" from 5 U.S.C. § 2104).

Even if there were uncertainty about the reach of the term "officer of the United States," it would be resolved in favor of a broad scope. To begin, disputes over the breadth of the Tort Claims Act "do[] not implicate the general rule that 'a waiver of the Government's sovereign immunity will be strictly construed . . . in favor of the sovereign.'" *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 491 (2006) (quoting *Lane v. Peña*, 518 U.S. 187, 192 (1996)). And here the statutory reference to "*any* officer" — as opposed to, say, *criminal* officer — supports an expansive reading. *See Boyle v. United States*, 556 U.S. 938, 944 (2009) ("The term 'any' ensures that the definition has a wide reach[.]" (citation omitted)). Furthermore, as recently as 2013 the Supreme Court clamped down on a cramped reading of the proviso. *See Millbrook*, 569 U.S. at 56–57. As the Fifth Circuit recently put it, "[t]he [*Millbrook*] Court held there to be no implicit limits on the

12

statutory language." *Campos v. United States*, 888 F.3d 724, 737 (5th Cir. 2018). If we follow suit, then no limiting words — like "criminal" or "traditional" before "officer" — should be added to the proviso.

The Supreme Court's expansive reading also set the tone for the Seventh Circuit's sweeping view of the proviso last year. *See Bunch v. United States*, 880 F.3d 938, 945 (7th Cir. 2018) (Wood, C.J.) (concluding that an ATF chemist could qualify under the proviso, and explaining that "[w]e are also influenced by the broad reading of the law-enforcement proviso that the Court adopted in *Millbrook*"). Our decision today that TSOs are "officer[s] of the United States" is consistent with the broad constructions announced in *Millbrook* and *Bunch*.

### 2. "... Empowered by Law..."

To repeat, the complete proviso definition for an "investigative or law enforcement officer" is "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). By its plain terms, the phrase "empowered by law" narrows the scope of "officer[s]" covered from the set of all "officer[s] of the United States" to the subset of those with the authority to, among other things, "execute searches."

Turning, then, to the statutory authority of TSOs, they are empowered by law to conduct "the screening of all passengers and property." 49 U.S.C. § 44901(a). Screening, in turn, is defined in part as a "physical examination," including a "physical search." *Id.* § 44901(g)(4) (regarding screening of luggage). Hence TSOs are "empowered by law" within the meaning of the proviso.

13

### 3. *". . . To Execute Searches . . ."*

TSO screenings are "searches" (i) as a matter of ordinary meaning, (ii) under the Fourth Amendment, and (iii) under the definition provided in *Terry v. Ohio*, 392 U.S. 1 (1968). Attempts to distinguish (iv) between administrative and criminal "searches" are divorced from the plain text, and any distinction, if one must be made, should account for (v) the fact that TSA searches extend to the general public and involve examinations of an individual's physical person and her property.

*(i) Ordinary Meaning.* — TSOs perform "searches" as understood in ordinary parlance. Of the many dictionary definitions that bear this out, to search is "to examine (a person) thoroughly to check on whatever articles are carried or concealed." *Search*, Webster's Third New International Dictionary (1971); *see also Search*, Black's Law Dictionary (4th ed. rev. 1968) ("an examination or inspection . . . with [a] view to discovery of stolen, contraband, or illicit property"). Dictionaries aside, one could simply ask any passenger at any airport. Indeed, the very TSOs who screened Pellegrino called their procedure a search: "While [a TSO] was doing the searches, [Pellegrino] continued to be verbally abusive. When the search was complete, the passenger asked that she repack her own bags . . . ." J.A. 215 (incident report).

The Aviation Security Act's statutory and regulatory regime reflects this ordinary usage. TSOs perform "screening[s] of all passengers and property," 49 U.S.C. § 44901(a), which include "physical search[es]," *id.* § 44901(g)(4) (screening of luggage). Likewise, TSA regulations provide that airlines "must refuse to transport . . . [a]ny individual who does not consent to a *search* or inspection of his or her person" and "[a]ny property of any individual or other person who does not consent to a *search*

14

or inspection of that property." 49 C.F.R. § 1544.201(c) (emphases added); *see also id.* § 1540.107(a) ("No individual may enter a sterile area or board an aircraft without submitting to the screening and inspection of his or her person and accessible property in accordance with the procedures being applied to control access to that area or aircraft under this subchapter.").

*(ii) Fourth Amendment.* — Setting aside the ordinary meaning of "search," airport screenings are searches as well under the Fourth Amendment. *George v. Rehiel*, 738 F.3d 562, 577 (3d Cir. 2013). No warrant is required, and no individualized suspicion need exist. *Id.*; *see also Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 675 n.3 (1989) (noting "the Federal Government's practice of requiring the *search* of all passengers seeking to board commercial airliners, as well as the *search* of their carry-on luggage, without any basis for suspecting any particular passenger of an untoward motive") (emphases added).

The Government does not dispute that holding. Instead, it contends that consent by passengers cancels the Fourth Amendment's effect. But the presence or absence of consent does not determine whether a search has occurred for purposes of the Fourth Amendment. *See George*, 738 F.3d at 575 ("The constitutionality of an airport screening search . . . does not depend on consent . . . . [A]ll that is required is the passenger's election to attempt entry into the secured area." (internal quotation marks omitted) (quoting *United States v. Aukai*, 497 F.3d 955, 961 (9th Cir. 2007) (*en banc*))). In any event, TSO screenings are not consensual. As noted, per TSA regulations any individual who does not consent to a "search or inspection" may not board a flight. 49 C.F.R. § 1544.201(c); *see also id.* § 1540.107(a).

15

*(iii) Meaning under* Terry. — TSA screenings even meet the definition of the particular subset of Fourth Amendment searches announced in *Terry* just six years before the enactment of the proviso. "[W]hen Congress employs a term of art, it . . . knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken . . . ." *FAA v. Cooper*, 566 U.S. 284, 292 (2012) (internal quotation marks omitted).

*Terry* provided a vivid definition of "search": "[I]t is nothing less than sheer torture of the English language to suggest that a *careful exploration of the outer surfaces of a person's clothing all over his or her body* in an attempt to find weapons is not a 'search.'" *Terry*, 392 U.S. at 16 (emphasis added). This is an apt description of the duties of a TSO, who by statute may "thoroughly conduct" an exploration "over an individual's entire body." 49 U.S.C. § 44935(f)(1)(B)(v). The TSA's website elaborates that TSOs inspect "sensitive areas such as breasts, groin, and the buttocks" and must use "sufficient pressure to ensure detection." Transp. Sec. Admin., *Security Screening*, https://www.tsa.gov/travel/security-screening (last visited Aug. 14, 2019). To deny that TSOs perform "searches" is to ignore *Terry*'s admonition against side-stepping the term's obvious meaning.

To be sure, *Terry* typically requires reasonable suspicion for a search. But that is not the point here. Under *Terry*, the existence of reasonable suspicion determines whether a search was justified, not whether it occurred in the first place. An inspection may meet the definition of "search" under *Terry* yet involve no reasonable suspicion. In that situation, the incident is still a search; it is simply an unlawful search.

*(iv) Refuting a Distinction Between Criminal and Administrative Searches.* — Some courts have perceived a distinction between two types of "searches": those based on individualized suspicion performed by criminal law enforcement (no doubt covered by the proviso), and those, like health inspections, that further an administrative purpose (not covered). *See, e.g.*, *Hernandez v. United States*, 34 F. Supp. 3d 1168, 1180–81 (D. Colo. 2014).

The only textual support for this distinction comes from the interpretive canon *noscitur a sociis* (to know something by its accompanying words). At three points in the proviso — "execute searches," "seize evidence," and "make arrests" — neighboring words arguably carry criminal connotations that possibly color the meaning of "searches." In reverse order, "mak[ing] arrests" to curb federal law violations no doubt has a criminal color, and TSOs (unless specially designated, *see* 49 U.S.C. § 114(p)) do not make arrests. They arguably seize evidence, but for our purposes they typically confiscate contraband in the pre-boarding process; thus we assume for the sake of argument that "seize evidence" also has a criminal connotation. If both making arrests and seizing evidence have criminal functions, why doesn't "execute searches"? After all, Congress typically uses "execute" in the sense of "to execute a search *warrant*," which is based on probable cause to believe that criminal activity exists. *E.g.*, 18 U.S.C. § 3109 (emphasis added).

But Congress chose not to include the terms "warrant" or "search warrant" in § 2680(h). For this reason, the Seventh Circuit recently rejected a reading of the proviso that would have limited "searches" to those based on warrants: "[S]ection 2680(h) does not require [the officer] to have had authority to seek and execute search *warrants*; it speaks only of executing searches, and many searches do not require warrants." *Bunch*, 880 F.3d at 945 (emphasis in original)

17

(citations omitted). This removes the proviso from the ambit of exclusively criminal searches. Nor does the verb "execute" automatically transform "searches" into specifically criminal searches; Congress uses milder verbs than "execute" even in the criminal context. *E.g.*, 42 U.S.C. § 2000aa-11(a)(4) (discussing requirements "for a warrant to conduct a search"). As a result, mere use of "execute" does not create a distinction between criminal searches and administrative searches.

Moreover, we are doubly slow to apply the *noscitur* canon here. Not only is the term "searches" clear, *see Russell Motor Car Co. v. United States*, 261 U.S. 514, 520 (1923), but the three duties in the proviso are listed in the disjunctive ("to execute searches, to seize evidence, *or* to make arrests"). "When Congress has separated terms with the conjunction 'or,'" the canon often "is of little help." *In re Continental Airlines, Inc.*, 932 F.2d 282, 288 (3d Cir. 1991) (Scirica, J.) (citations omitted). Each of the three duties independently suffices to define "investigative or law enforcement officer." *See Bunch*, 880 F.3d at 943. As even the counsel for the Government stated at oral argument, satisfying the proviso "would depend . . . on the individual statutory authority" measured against the three listed duties. Tr. of En Banc Oral Arg. at 35:10–11. We agree; the three statutory duties in the proviso begin and end the inquiry. No resort to amorphous criminal connotations is warranted.

No surprise, then, that every decision on the scope of the proviso tests whether any single duty is statutorily present. Some federal officers qualify because they perform "searches." *See Bunch*, 880 F.3d at 943 (ATF chemists); *cf. Caban*, 671 F.2d at 1234 n.4 (immigration agents). Others make arrests, and therefore qualify even if they don't play a traditional law enforcement role. *See Campos*, 888 F.3d at 737 (Customs and Border Protection officers); *Nurse v.*

*United States*, 226 F.3d 996, 1002 (9th Cir. 2000) (same); *Celestine v. United States*, 841 F.2d 851, 853 (8th Cir. 1988) (*per curiam*) (Veterans' Administration hospital security guards); *Hernandez v. Lattimore*, 612 F.2d 61, 64 n.7 (2d Cir. 1979) (Bureau of Prisons officers); *cf. Moore*, 213 F.3d at 708 (postal inspectors). Only when officers lack all three duties are they outside the scope of the proviso. *See Wilson v. United States*, 959 F.2d 12, 15 (2d Cir. 1992) (*per curiam*) (parole officers); *EEOC v. First National Bank of Jackson*, 614 F.2d 1004, 1008 (5th Cir. 1980) (Equal Employment Opportunity Commission agent); *Solomon v. United States*, 559 F.2d 309, 310 (5th Cir. 1977) (*per curiam*) (security guard at military exchange). These cases do not speak in terms of "criminal" or "non-criminal" functions. Instead, they measure each job's statutory duties against the three duties listed in the proviso. Our reading does the same.

Indeed, we could apply the same analysis to both TSOs and TSA "law enforcement officers" per 49 U.S.C. § 114(p)(1). Between the two groups, all three of the proviso's listed duties are accounted for. TSA law enforcement officers are authorized to (i) make arrests and (ii) seize evidence, *see id.* § 114(p)(2), while TSOs (iii) execute searches, *see id.* § 44901(a). Taken together, the roles of both groups map onto the three-part, and disjunctive, definition set out in the proviso.

Another conceivable way the *noscitur* canon might arrive at a distinction between criminal and administrative searches is by parsing the particular intentional torts against which the proviso waives immunity: assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. To be sure, these torts are commonly claimed against criminal law enforcement officers performing criminal law functions. But as our case demonstrates, that these torts are *typically* brought against criminal law

19

enforcement officers does not mean that they are *exclusively* brought against them.

Nor does a lack of training on the constitutional doctrines underpinning these torts absolve TSOs of liability. Congress knows how to define "law enforcement officers" by reference to training. *See, e.g.*, 12 U.S.C. § 248(q)(4) ("[T]he term 'law enforcement officers' means personnel who have successfully completed law enforcement training . . . ."). Here, by contrast, the proviso defines "investigative or law enforcement officer" not by reference to constitutional training, but by the legal authority to "execute searches." Training has no bearing on whether TSOs are "investigative or law enforcement officers." For good reason, no court has ever relied on an officer's lack of training to conclude that she was not an "investigative or law enforcement officer" under 28 U.S.C. § 2680(h).

At bottom, Congress chose to re-waive sovereign immunity only for certain torts to cabin the Government's liability, not to provide an indirect textual clue about the meaning of "investigative or law enforcement officer." *See Sami v. United States*, 617 F.2d 755, 764–65 (D.C. Cir. 1979) ("[B]y limiting the wrongs covered in the § 2680(h) exception . . . , Congress set finite boundaries around the kind of law enforcement abuses for which it wished to make the government liable.").

*(v) Distinctions From Typical Administrative Searches.* — If we must draw distinctions between "searches" in the proviso, the possible distinction between criminal and administrative searches is incomplete. A further distinction within administrative searches may be needed — one that accounts for the physically intrusive and ubiquitous nature of TSA searches.

20

To begin, TSO screenings often involve invasive examinations of the physical person. As even the panel majority in this case acknowledged, TSA searches are "rigorous and intimate for individuals." *Pellegrino*, 896 F.3d at 230. This sets them apart from other administrative searches that involve only inspections of property or the environment. *E.g.*, 21 U.S.C. § 606(a) (providing for "an examination and inspection of all meat food products"); 15 U.S.C. § 330c(a) (providing for "inspection of the books, records, and other writings" relating to weather modification).

The intimate physical nature of TSA searches also harmonizes our decision today with *Matsko v. United States*, 372 F.3d 556 (3d Cir. 2004), in which we held that an inspector of the Mine Safety and Health Administration, who had the "authority to inspect mines and investigate possible violations," was not covered by the proviso. *Id.* at 560 (citation omitted). Our Court also asserted in a *dictum* that "employees of administrative agencies, no matter what investigative conduct they are involved in, do not come within the § 2680(h) exception." *Id.* Taken literally, this statement says too much; employees of "administrative agencies" such as the FBI, DEA, and ATF all are within the ambit of § 2680(h). To the extent *Matsko* can be read to hold that mine safety inspectors are outside the proviso simply because they are administrative agency employees, it is no longer valid.

Next, the risk of abuse is greater for TSO screenings than for most other administrative searches. Because TSA searches affect the public directly, the potential for widespread harm is elevated. This potential for abuse in borne out by Pellegrino's own experience. There is a reason

21

that FDA meat inspectors do not generate headlines about sexual assault and other intimate violations.[3]

In sum, we hold only that TSO screenings are "searches" under the proviso because they are more personal than traditional administrative inspections — they extend to the general public and involve examinations, often intrusive, of an individual's physical person along with her property.

---

[3] *See, e.g.*, Rowaida Abdelaziz, *Muslim Woman Says TSA Forced Her to Show Her Bloodied Pad During Airport Screening*, Huffington Post (Aug. 23, 2018), https://bit.ly/2LjzI7r; Lori Aratani, *Watch the Video of TSA Officers Doing a Pat-Down of a 96-Year-Old Woman in a Wheelchair That Has People Outraged*, Wash. Post (June 12, 2018), https://wapo.st/2Om6SFi; Travis Andrews, *'You Cannot Touch Me There,': Breast Cancer Patient Claims TSA 'Humiliated' and 'Violated' Her*, Wash. Post (Dec. 8, 2016), http://wpo.st/ieQP2; Elizabeth Chuck, *Father Outraged by 'Uncomfortable' TSA Pat-Down on 10-Year-Old Daughter*, NBC News (Jan. 6, 2016), http://nbcnews.to/1Ju6h0M; Ray Sanchez, *New York TSA Worker Accused of Sexually Abusing Passenger*, CNN (Aug. 29, 2015, 7:29 AM), https://www.cnn.com/2015/08/28/us/new-york-tsascreener-charged/index.html; Omar Villafranca, *TSA Agents Allegedly Strip-Search Woman, Fiddle with Feeding Tube*, NBC News (July 19, 2012), http://bit.ly/2dk1VjL; Richard Esposito & Alicia Tejada, *Now Three Grandmas Say They Were Strip-Searched at JFK*, ABC News (Dec. 6, 2011), http://abcn.ws/2dSDiJL.

### 4. "... For Violations of Federal Law."

Under the proviso, investigative or law enforcement officers must be authorized "to execute searches, to seize evidence, or to make arrests *for violations of Federal law*." 28 U.S.C. § 2680(h) (emphasis added). To begin, the phrase "for violations of Federal law" may not even apply to the power to "execute searches." When interpreting a statute that includes "a list of terms or phrases followed by a limiting clause," that clause "should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. United States*, 136 S. Ct. 958, 962 (2016) (citations omitted). This is the so-called rule of the last antecedent, which the Supreme Court recently applied as follows: Interpreting a statute listing "aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward," the Court held that "the limiting phrase that appears at the end of that list — 'involving a minor or ward' — . . . modifies only 'abusive sexual conduct,' the antecedent immediately preceding it." *Id.* (construing 18 U.S.C. § 2252(b)(2)). Applying that rule here, the phrase "for violations of Federal law" would modify only the last antecedent, "make arrests," not "execute searches."

But we need not decide whether that rule applies here, as TSOs do execute searches "for violations of Federal law." *See, e.g.*, 49 U.S.C. § 46505 (providing criminal penalties for "[c]arrying a weapon or explosive on an aircraft"); 49 C.F.R. §§ 172.101, 175.10(a) (listing "hazardous materials" that are not permitted on flights). The phrase "for violations of Federal law" sweeps notably broader than other statutes that specify violations of *criminal* law. *See, e.g.*, 18 U.S.C. § 115(c)(1) (defining "Federal law enforcement officer" by reference to "any violation of Federal criminal law"); 5 U.S.C. § 8331(20) (defining "law enforcement officer" by reference to "offenses against the criminal laws of the United

23

States"). To be sure, Congress could have said that an officer could "seize evidence" or "make arrests" only "for violations of Federal [*criminal*] law." But it didn't. And even if it did, TSOs search for weapons and explosives, and carrying them on board an aircraft is a criminal offense. *See, e.g.*, 49 U.S.C. § 46505; *see also Enforcement Sanction Guidance Policy*, Transp. Sec. Admin., https://www.tsa.gov/sites/default/files/enforcement_sanction_ guidance_policy.pdf (last visited Aug. 15, 2019) (noting that TSOs may refer offenders "for criminal investigation and enforcement . . . where there appears to be a violation of criminal laws"). In sum, "violations of Federal law" means only what it says; by its plain text, it covers more than just *criminal* violations.

Finally, that airport contraband is legal in some non-flight contexts does not change this conclusion. As long as TSOs screen for items federal law bars on airplanes, they are searching for "violations of Federal law."

## B. *Usages of "Law Enforcement Officer" Beyond the Proviso*

The textual analysis above is enough to satisfy the proviso's four-part definition of "investigative or law enforcement officer." For three reasons, other statutory usages of "law enforcement officer" beyond the proviso do not change that outcome.

First, Congress's use of the bare term "law enforcement officer" says nothing about the term "*investigative or* law enforcement officer" in the proviso. "[O]r" is "disjunctive," and "terms connected by a disjunctive [should] be given separate meanings unless the context dictates otherwise." *United States v. Urban*, 140 F.3d 229, 232 (3d Cir. 1998) (internal quotation marks omitted); *see*

24

*also* Whether Agents of the Department of Justice Office of Inspector General Are 'Investigative or Law Enforcement Officers' Within the Meaning of 18 U.S.C. § 2510(7), 14 Op. O.L.C. 107, 108 (1990) (recognizing that the disjunctive "or" means that "law enforcement" officers must be different from "investigative" officers). This diminishes any purported value of several statutes that define "law enforcement officer" in criminal circumstances. *E.g.*, 5 U.S.C. § 8331(20) (providing that "'law enforcement officer' means . . . ."); 12 U.S.C. § 248(q)(4) (providing that "the term 'law enforcement officers' means . . . ."); 18 U.S.C. § 245(c) (same); *id.* § 1515(a)(4) (same); *id.* § 115(c)(1) (providing that "the term . . . 'Federal law enforcement officer' means . . . ."). Deploying these other statutes to discern the meaning of § 2680(h) "would render a significant part of [the proviso] a nullity," *see Prot. & Advocacy for Persons with Disabilities v. Mental Health & Addiction Servs.*, 448 F.3d 119, 125 (2d Cir. 2006) (Sotomayor, J.), by disregarding its reference to "investigative" officers. That disregard "violates the settled rule that a statute must . . . be construed in such fashion that every word has some operative effect." *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992) (citations omitted).

Second, it is unnecessary to explore the entire U.S. Code to discern the contours of the term "investigative or law enforcement officer," because Congress provided an expressly local definition in the proviso. "When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) (citation omitted); *see also Bond v. United States*, 572 U.S. 844, 871 (2014) (Scalia, J., concurring in the judgment) (observing that we may not resolve any perceived "'dissonance' between ordinary meaning and the unambiguous words of a definition . . . in favor of ordinary meaning" because, "[i]f that were the

case, there would hardly be any use in providing a definition"). The proviso fits this rule: "*For the purpose of this subsection,* 'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h) (emphasis added). Indeed, criminal-related definitions of "law enforcement officer" are also expressly local. *See, e.g.*, 5 U.S.C. § 8331(20) ("For the purpose of this subchapter . . . ."); 12 U.S.C. § 248(q)(4) ("For purposes of this subsection . . . ."); 18 U.S.C. § 115(c)(1) ("As used in this section . . . ."); *id.* § 245(c) ("For purposes of the preceding sentence . . . ."); *id.* § 1515(a)(4) ("As used in sections 1512 and 1513 of this title and in this section . . . ."); *id.* § 2510(7) ("As used in this chapter . . . ."). In short, the proviso's own definition overrides any other usages of "law enforcement officer."

Third, Congress knows how to give an explicitly "criminal" meaning to the term "law enforcement officer," and it chose not to do so here. *See, e.g.*, 5 U.S.C. § 8331(20) (defining "law enforcement officer" by reference to "offenses against the criminal laws of the United States"); 18 U.S.C. § 115(c)(1) (defining "Federal law enforcement officer" by reference to "any violation of Federal criminal law"); *id.* § 2510(7) (defining "investigative or law enforcement officer" by reference to "offenses enumerated in this chapter [of the criminal title]"); 34 U.S.C. § 12392(b)(2) ("state and local criminal law enforcement officials"). That other usages of "law enforcement officer" explicitly speak in terms of "criminal" law only heightens the absence of any such reference in § 2680(h). Hence the proviso is not confined to "criminal" law enforcement officers.

26

*C. No Recourse to Legislative History*

We make no mention of legislative history. Where a statute is unclear on its face, good arguments exist that materials making known Congress's purpose "should be respected, lest the integrity of legislation be undermined." Robert A. Katzmann, *Judging Statutes* 4 (2014). Accordingly, our Court "has declined to employ legislative history if a statute is clear on its face," but "we have allowed recourse to legislative history in the face of ambiguity." *Bruesewitz v. Wyeth, Inc.*, 561 F.3d 233, 244 (3d Cir. 2009) (Smith, J.), *aff'd sub nom. Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) (Scalia, J.) (noting that "legislative history is persuasive to some because it is thought to shed light on what legislators understood an ambiguous statutory text to mean" (citation omitted)).

Here, however, the text tells the tale. *Cf. United States v. A.M.*, 927 F.3d 718, 719 (3d Cir. 2019) ("The text of a law governs its reach. We will neither read in new limits nor read out existing limits on its application."). Congress could have chosen to insert "criminal" into the proviso. It did not, and thus we follow suit.[4]

---

[4] Even precise and voluminous legislative history can be off the mark at times. For example, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, was enacted in 1970 to combat the rise of organized crime. *See, e.g.*, *United States v. Turkette*, 452 U.S. 576, 589 (1981) ("[I]t was the declared purpose of Congress 'to seek the eradication of organized crime in the United States . . . .'") (quoting the statement of findings prefacing the Organized Crime Control Act of 1970, Pub. L. 91-452, 84 Stat. 923); *see also* 116 Cong. Rec. 602 (1970)

Our following Congress's lead rests on our view of the proper relationship between Congress and the courts. As we recently put it,

> [t]he critical question is who should decide whether to provide for a damages remedy, Congress or the courts? Most often, the answer is Congress. Because, when an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them.

---

(remarks of Sen. Yarborough) ("a full scale attack on organized crime"); *id.* at 819 (remarks of Sen. Scott) ("purpose is to eradicate organized crime in the United States"); *id.* at 35199 (remarks of Rep. Rodino) ("a truly full-scale commitment to destroy the insidious power of organized crime groups"). But, following "the statute as written" to its logical linguistic conclusion, the Supreme Court allowed private civil actions under RICO against not only "the archetypal, intimidating mobster," but also "respected and legitimate enterprises." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985) (quotation marks omitted). In doing so, the Court recognized that RICO was "evolving into something quite different from the original conception of its enactors," *id.* at 500, but insisted that the job of correcting "this defect — if [a] defect it is — . . . lie[s] with Congress," *id.* at 499. "[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Id.* (quotations omitted). So too with the proviso.

*Vanderklok*, 868 F.3d at 206 (citations and quotations omitted). Our reading today is consistent with this conception of the judicial role. As counsel for the Government put it at oral argument, "ultimately it's up to Congress to create a remedy." Tr. of En Banc Oral Arg. at 44:9–10. Here, Congress has created a remedy; we are simply giving effect to the plain meaning of its words.

## D. *Consequences of Our Ruling*

Before concluding, we note the implications of the choice before us. If TSOs are not "investigative or law enforcement officers" under the proviso, then plaintiffs like Pellegrino are left with no avenue for redress. We have already held (and correctly so) that TSOs are not susceptible to an implied right of action under *Bivens* for alleged constitutional violations, *see Vanderklok*, 868 F.3d at 209, so a Tort Claims Act action is the only remaining route to recovery. Without recourse under that Act, plaintiffs like Pellegrino will have no remedy when TSOs assault them, wrongfully detain them, or even fabricate criminal charges against them.

If, on the other hand, TSOs are "investigative or law enforcement officers," we discern no risk of sweeping liability and certainly no concomitant threat to the public fisc. In 2015, for example, fewer than 200 people (out of over 700 million screened) filed complaints with the TSA alleging harm that would fall within the scope of the proviso. Corrected Tr. of Panel Oral Arg. at 26:8–17. In 2017, only one out of every 100,000 passengers lodged a complaint about the "courtesy" of a TSO, *see* Gary S. Becker, *TSA Complaint Data Reveals Airport Screening Trends*, Security Debrief (Mar. 16, 2018), http://securitydebrief.com/2018/03/16/tsa-complaint-data-airport-screening/, a statistic beyond suits alleging harm that

could fit § 2680(h). If past is prologue, a passenger is unlikely to bother bringing a suit short of facing mistreatment akin to Pellegrino's.

Nor is our ruling meant to draw every administrative search into the ambit of the proviso. As explained above, TSO screenings fall within the proviso because they are more personal than traditional administrative inspections: They extend to the general public and involve searches of an individual's physical person and her property. *See supra* pp. 20–22.

## Conclusion

Words matter. This core tenet of statutory interpretation channels our conclusion today: TSOs are "investigative or law enforcement officers" as defined in the Tort Claims Act at 28 U.S.C. § 2680(h). They are "officer[s] of the United States" by dint of their title, badge, and authority. They are "empowered by law to execute searches" because, by statutory command and implementing regulation, they may physically examine passengers and the property they bring with them to airports. And the TSOs' searches are "for violations of Federal law" given that their inspections are for items that federal law bans on aircraft (often with criminal consequences).

As nearly all of us can attest who have flown on an aircraft in the United States, the overwhelming majority of TSOs perform their jobs professionally despite far more grumbling than appreciation. Their professionalism is commensurate with the seriousness of their role in keeping our skies safe. The life-and-death duties entrusted to them fall naturally within the ambit of the proviso.

Thus we reverse the decision of the District Court as it pertains to the interpretation of the proviso in the Tort Claims Act. We affirm in all other respects.

KRAUSE, *Circuit Judge*, dissenting, joined by JORDAN, HARDIMAN, and SCIRICA, *Circuit Judges*.

The Majority and I agree that words matter, that our role is to interpret Congress's statute and not to rewrite it, and that the United States retains sovereign immunity absent a clear and unambiguous waiver. But our statutory analyses of the so-called "law enforcement proviso" lead us to very different conclusions and demonstrate definitively, in my view, that TSA screeners do not qualify as "investigative or law enforcement officers." At the very minimum, however, these two thoughtful opinions demonstrate that the proviso is susceptible to divergent yet "plausible interpretation[s]." *FAA v. Cooper*, 566 U.S. 284, 290–91 (2012). That conclusion, in and of itself, requires us to affirm the District Court's dismissal of Pellegrino's FTCA claims because "a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text," and "[a]ny ambiguities in the statutory language are to be construed in favor of immunity." *Id.* at 290 (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)).

From its earliest days, the Supreme Court has counseled that the "meaning of a word, and consequently, the intention of the legislature," must be "ascertained by reference to the context" in which that word appears. *Neal v. Clark*, 95 U.S. 704, 709 (1878). I therefore read the words at issue in the context of the statute as a whole and of settled Fourth Amendment doctrine to conclude that the law enforcement proviso is limited by its terms to officers empowered to exercise traditional police powers—including investigatory searches for law enforcement purposes, but not administrative searches for programmatic purposes.

1

The Majority, by contrast, dissects the law enforcement proviso into individual words and isolated phrases—text without context—and picks the broadest conceivable definition of each word. It thereby recasts Congress's chosen words—"any officer of the United States empowered by law to execute searches . . . for violations of Federal law"—in its own mold as "any Federal employee empowered to perform a Fourth Amendment search . . . for any purpose." In this way, the Majority provides a remedy where Congress has not and sweeps in not just TSA screeners, but also countless other civil servants, simply because they (a) are employed by the federal government; and (b) have authority to perform inspections, issue administrative subpoenas, conduct audits, perform drug testing, or conduct any of the countless other routine, suspicionless searches authorized by federal law.

That breathtaking expansion of the proviso is textually unsound, departs from other circuits, and contravenes the rule that waivers of sovereign immunity must be strictly construed in favor of the Government. Because we should be reading Congress's words together to give them the meaning that Congress intended and because we should not subject the United States Treasury to vast tort liability where Congress has not done so clearly and unambiguously, I respectfully dissent.

I.   **The Plain Language of the Proviso Excludes Administrative Employees, Like TSA Screeners, Who Conduct Routine, Suspicionless Searches**

As with all cases involving statutory interpretation, the text must guide our analysis. But text cannot be interpreted in a vacuum. In law as in life, the meaning that we ascribe to words depends on the words that surround them, considering both "the specific context in which that language is used, and

2

the broader context of the statute as a whole."  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *see Abramski v. United States*, 573 U.S. 169, 179 (2014) (explaining that courts must "interpret the relevant words not in a vacuum, but with reference to the statutory context").  If a friend told me she was "held up," for example, I would need to consider the context to know if she had been robbed or merely delayed.  As applied to statutes, this commonsense principle, in legal jargon termed *noscitur a sociis*, is "wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress."  *Dolan v. USPS*, 546 U.S. 481, 486 (2006) (quoting *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961)).

Applying this principle to interpret the words of the law enforcement proviso in their statutory context, TSA screeners are neither "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law," nor empowered by law as "officer[s] of the United States."  28 U.S.C. § 2680(h).

> **A.  Screeners Are Not "Empowered by Law to Conduct Searches . . . for Violations of Federal Law"**

The law enforcement proviso waives sovereign immunity only if the alleged tortfeasor "is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  28 U.S.C. § 2680(h).  The Majority contends the proviso covers TSA screeners because they are "empowered by law to *execute searches . . .* for *violations of Federal law*."  28 U.S.C. § 2680(h) (emphasis added).  Read in context, however, "execute searches . . . for violations of Federal law" connotes traditional police powers and refers to

3

investigatory searches, not administrative searches.

1. The Law Distinguishes Between Investigatory and Administrative Searches, with TSA Screeners Conducting Only the Latter

To interpret the meaning of "execute searches . . . for violations of Federal law," I begin with contemporaneous dictionaries and Fourth Amendment jurisprudence. While leaning on Black's Law Dictionary to pick a favored definition of "officer," *see* Maj. Op. 9, the Majority omits that the same edition defined "search" as "[a]n examination of a man's house or other buildings or premises, or of his person, *with a view to the discovery of . . . some evidence of guilt to be used in the prosecution of a criminal action*."[1] *Search*, Black's Law Dictionary 1518 (4th ed. 1968) (emphasis added). As this definition reflects, when Congress passed the law enforcement proviso in 1974, "execute search," just like "seize evidence" and "make arrests," referred in the law primarily to the exercise

---

[1] In a curious "see also" citation, the Majority quotes what it describes as a definition of "[s]earch" that purportedly would cover TSA screenings. *See* Maj. Op. 14. But the Majority is not quoting the definition of "search," but rather the definition of the separate entry for "unlawful search." And once the omission in the Majority's quotation is restored, it is clear that the definition actually refers to traditional investigatory searches: "[a]n examination or inspection without authority of law of premises or person with view to discovery of stolen, contraband, or illicit property, *or for some evidence of guilt to be used in prosecution of criminal action*." *Unlawful Search*, Black's Law Dictionary 1518 (4th ed. 1968) (emphasis added).

4

of traditional police powers.

At that time, "search" had only recently entered the legal lexicon to refer to examinations "for *non-law-enforcement purposes* such as employee drug screenings, building inspections, health inspections, and other administrative inspections." *Special-Needs Doctrine*, Black's Law Dictionary (11th ed. 2019); *see Administrative Search*, Black's Law Dictionary (11th ed. 2019) (origin date of 1960); Eve Brensike Primus, *Disentangling Administrative Searches*, 111 Colum. L. Rev. 254, 260 (2011) (noting that "the concept of administrative searches first entered the law in the 1960s"). To distinguish these searches from investigatory ones, they were (and often still are) called "inspections," "inspection searches," "regulatory searches," or "administrative searches." *Administrative Search*, Black's Law Dictionary (11th ed. 2019); *see Inspection Searches*, Black's Law Dictionary 717 (5th ed. 1979).

Then, as now, the distinction between these two types of searches undergirds much of Fourth Amendment doctrine. In its foray into administrative searches, the Supreme Court held that the Fourth Amendment posed no barrier, because they were not "searches for evidence to be used in criminal prosecutions." *Frank v. Maryland*, 359 U.S. 360, 365 (1959); *see* 5 Wayne R. LaFave, *Search & Seizure* § 10.1(a) (5th ed. 2018) (observing that under *Frank* the Fourth Amendment's applicability "depended upon whether the search was a part of a criminal investigation which might lead to prosecution"). Even when later overruling *Frank*, the Court deemed administrative searches a distinct category of "search" that did not require individualized suspicion because a routine inspection presented "a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of

5

crime." *Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 530, 538 (1967). And to this day, the Court continues to differentiate between investigatory and administrative searches, *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000), with the "critical" distinction between these two types of searches lying in their "primary purpose," *Ferguson v. City of Charleston*, 532 U.S. 67, 83–84 (2001).

Investigatory searches, which pertain "to criminal investigations, not routine, noncriminal procedures," *Colorado v. Bertine*, 479 U.S. 367, 371 (1987) (citation omitted), have as their "primary purpose . . . to detect evidence of ordinary criminal wrongdoing," and serve "the general purpose of investigating crime," *Edmond*, 531 U.S. at 38, 39; *see Ferguson*, 532 U.S. at 73, 77, 83 (distinguishing searches with "criminal investigatory purposes" and "the immediate objective . . . to generate evidence for law enforcement purposes" from "constitutionally permissible suspicionless searches" (emphasis omitted)); *Whren v. United States*, 517 U.S. 806, 811–12 (1996) (distinguishing searches for "violation of law" from administrative searches).

Administrative searches, on the other hand, require neither individualized suspicion nor a warrant, but only because "the 'primary purpose' of the search[] is '[d]istinguishable from the general interest in crime control'" and is "other than conducting criminal investigations."[2] *City*

---

[2] While the Supreme Court has also deemed school searches a type of "special needs" search, they differ from administrative searches because they are conducted to determine whether a child "has violated or is violating . . . the law" and therefore require reasonable suspicion. *New Jersey*

6

*of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452 (2015) (quoting *Edmond*, 531 U.S. at 44). These administrative searches are ubiquitous and include regulatory searches, *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 74 (1970), administrative subpoenas, *Donovan v. Lane Steer, Inc.*, 464 U.S. 408, 415 (1984), inventory searches, *South Dakota v. Opperman*, 428 U.S. 364, 382–83 (1976), workplace drug testing, *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 620–21 (1989), and border checkpoints, *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976)—just to name a few.

Of these two types of searches, the screenings "now routine at airports and at entrances to courts and other official buildings," *Chandler v. Miller*, 520 U.S. 305, 323 (1997), fall squarely within the realm of "administrative searches," *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 675 n.3 (1989). At airports, such suspicionless screenings are not implemented to gather evidence of a crime with an eye toward criminal prosecution,[3] but rather to effect "an administrative

---

*v. T.L.O.*, 469 U.S. 325, 342 (1985); *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009); *see O'Connor v. Ortega*, 480 U.S. 709, 726 (1987) (declining to resolve whether workplace searches require individualized suspicion). School searches are therefore "special needs" searches not because they further an administrative purpose, but because of the government's unique role as custodian of children. *See T.L.O.*, 469 U.S. at 342.

[3] Most of the prohibited items for which TSA screeners search are perfectly legal to possess in other contexts. *See What Can I Bring?*, TSA, https://www.tsa.gov/travel/security-

7

purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft," *United States v. Aukai*, 497 F.3d 955, 960 (9th Cir. 2007) (en banc) (internal quotation marks and citation omitted), and thereby "prevent[] hijacking or like damage," *Von Raab*, 489 U.S. at 675 n.3 (quoting *United States v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974) (Friendly, J.)).

Unsurprisingly, then, TSA policy directs that screenings "be tailored to the transportation security purpose for which they are conducted" and forbids "[a]dministrative and special needs searches . . . to detect evidence of crimes unrelated to transportation security."  TSA Mgmt. Directive No. 100.4 ¶¶ 6.B(1), C(1).  If a screener's preventative screening happens to uncover evidence of a crime, she must "refer it to a supervisor or a law enforcement official for appropriate action"; she cannot seize the item, continue searching, or make an arrest.  *Id.* ¶ 6.C(1); *see also id.* ¶ 6.G(2).  The "only TSA personnel who [can] engage in law enforcement activities"— such as detentions, arrests, seizures, and investigatory searches—are TSA "law enforcement officers."  *Id.* ¶ 6.G(3); *see* TSA Mgmt. Directive No. 1100.88-1 ¶ 4.A.

Thus, properly framed, the question presented today is

---

screening/whatcanibring/all (last visited Aug. 13, 2019).  Thus, if an individual is found with a prohibited item, the TSA can impose only civil penalties:  "Criminal penalties and fines are different and wholly separate from the civil penalties assessed by TSA," and "[r]eferral for criminal investigation and enforcement is appropriate where there appears to be a violation of criminal laws."  *Enforcement Sanction Guidance Policy*, TSA, https://www.tsa.gov/sites/default/files/ enforcement_sanction_guidance_policy.pdf (last visited Aug. 13, 2019); *see also* 49 C.F.R. § 1503.401.

whether, in enacting the proviso, Congress meant to include only traditional investigatory searches aimed at uncovering "evidence of guilt to be used in the prosecution of a criminal action," *Search*, Black's Law Dictionary 1518 (4th ed. 1968), or also the then-newly recognized class of administrative searches.

2.      The Law Enforcement Proviso Covers Only Investigatory Searches

In determining whether Congress intended to cover administrative searches, we need not look beyond the proviso's inclusion of "execute," "for violations of Federal law," the other duties ("seize evidence" and "make arrests"), "investigatory or law enforcement officer," and a narrowly defined list of intentional torts. Each phrase suggests that Congress intended to refer only to investigatory searches, and together, they convey Congress's unmistakable intent.

*Execute Searches*. The proviso does not use the word "search" alone; it refers to the power to "execute searches"—a term of art. Without exception, every other statute in the United States Code that uses this phrase refers to investigatory searches. *E.g.*, 18 U.S.C. § 2231(a); *id.* § 2234; *id.* § 3109; 22 U.S.C. § 2709(a)(2). So does every Supreme Court and circuit case that had been published before the proviso was enacted. *See, e.g.*, *Chimel v. California*, 395 U.S. 752, 756 (1969); *Ng Pui Yu v. United States*, 352 F.2d 626, 628 (9th Cir. 1965). Conversely, Congress typically uses markedly different phrasing when granting employees the power to perform

9

administrative searches.[4] *See, e.g.*, 49 U.S.C. § 44901(a) (TSA screeners conduct "screening[s]"); 29 U.S.C. § 657(a)(2) (OSHA inspectors may "inspect and investigate"); 21 U.S.C. § 374(a)(1) (FDA inspectors may "enter" and "inspect"); 42 U.S.C. § 6927(a) (authorizing EPA inspectors "to enter" and "to inspect"). Use of the phrase "execute searches" thus signifies Congress's intent to refer to investigatory searches.

Implying that it has some relevance to the plain meaning of "execute searches," the Majority observes that Congress sometimes uses "milder" verbs than "execute" in the criminal context and that the proviso does not include the terms "warrant" or "search warrant." Maj. Op. 18. But those observations are neither here nor there: The point is not that "execute" is a "harsh" word (as opposed to a "mild" one), but that the words "execute" and "search" must be read together, not in isolation. When Congress uses the phrase "execute searches," it invariably refers to traditional investigatory searches. And, of course, "execut[ing] searches" in the criminal context is not limited to the execution of warrants. Investigatory searches also include brief stops if an officer reasonably suspects that "criminal activity may be afoot," *Terry v. Ohio*, 392 U.S. 1, 30 (1968); searches incident to arrest to protect officers and "to prevent the concealment or destruction" of evidence, *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (internal alterations, emphasis, and citation omitted); and protective sweeps "to ensure [officers'] safety after, and

---

[4] The section of the ATSA that the Majority quotes for the proposition that TSA screeners conduct "physical search[es]," Maj. Op. 13, 14, in fact relates to searches of cargo, not passengers, *see* 49 U.S.C. § 44901(g)(4).

10

while making, [an] arrest," *Maryland v. Buie*, 494 U.S. 325, 334 (1990).

For Violations of Federal Law. Beyond the word "execute," the term "searches" is further qualified by the phrase "for violations of Federal law."[5]  28 U.S.C. § 2680(h). That phrase immediately follows a "single, integrated list," so it modifies each term in the list. *Jama v. ICE*, 543 U.S. 335, 344 n.4 (2005); *see also Paroline v. United States*, 572 U.S. 434, 447 (2014).  And "violations of Federal law" must refer to criminal law given that the phrase also modifies "make arrests," which can only be made for violations of Federal *criminal* law.  Otherwise, the phrase "for violations of Federal law" would carry one meaning when modifying "make arrests"

---

[5] The Majority expresses skepticism on this point based on the rule of the last antecedent.  Maj. Op. 23.  But, as the Supreme Court recently cautioned, "that . . . rule would not be appropriate where the 'modifying clause appear[s] . . . at the end of a single, integrated list.'" *Lockhart v. United States*, 136 S. Ct. 958, 965 (2016) (second and third alteration in original) (quoting *Jama v. ICE*, 543 U.S. 335, 344 n.4 (2005)).  Instead, where, as here, "the listed items are simple and parallel without unexpected internal modifiers or structure," and are "items that readers are used to seeing listed together"—much less where it is "a concluding modifier that readers are accustomed to applying to each of them"—that modifier should be read as applying to each item.  *Id.* at 963 (providing as an example "the laws, the treaties, and the constitution of the United States" (internal quotation marks and citation omitted)).  Those descriptions apply to a tee to the way "for violations of Federal law" modifies "to execute searches, to seize evidence, or to make arrests" in 28 U.S.C. § 2680(h).

11

yet another when modifying "execute searches." That cannot be. *See, e.g.*, *Clark v. Martinez*, 543 U.S. 371, 378 (2005) ("To give the[] same words a different meaning for each category would be to invent a statute rather than interpret one.").

Given the criminal connotation of "for violations of Federal law," i.e., "to generate evidence *for law enforcement purposes*," *Ferguson*, 532 U.S. at 83, instead of for "programmatic purpose[s]," *id.* at 81, the searches TSA screeners conduct simply are not "search[es] . . . for violations of Federal law." 28 U.S.C. § 2680(h). That screeners conduct searches, up to and including pat-downs and property searches, only for an administrative purpose was the premise of *United States v. Hartwell*, 436 F.3d 174, 181 n.13 (3d Cir. 2006) (Alito, J.), and the condition of their constitutionality set by the Supreme Court in *Von Raab*, *Chandler*, and *Edmond*. Indeed, the Supreme Court "ha[s] never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 41. To the contrary, it has repeatedly explained that if the purpose of a routine, suspicionless search is for "violation[s] of law," *Whren*, 517 U.S. at 811, and not to serve "special needs, beyond the normal need for law enforcement," the entire program would be unconstitutional, *Edmond*, 531 U.S. at 37; *Ferguson*, 532 U.S. at 79 (holding that the search must advance an interest "divorced from the State's general interest in law enforcement").

The Majority argues that because carrying weapons or explosives on an aircraft is a criminal offense and screeners are authorized to search for those items, screeners are searching "for violations of Federal law," even if that does have criminal connotations. But aside from the constitutional cloud that would place over the entire TSA screening program, this

12

argument misapprehends the administrative search doctrine. There is no doubt that (as in Pellegrino's case) a screening aimed at removing prohibited items may turn up evidence of a crime and lead to prosecution, just as may a sobriety checkpoint aimed at removing drunk drivers from the road or a border search aimed at removing illegal aliens from smuggling operations. But the Supreme Court has made clear that such inspections do not become searches for "violation[s] of law," *Whren*, 517 U.S. at 811, as the Majority suggests, "simply because, in the course of enforcing [the regulatory scheme], an inspecting officer may discover evidence of crimes."[6] *New York v. Burger*, 482 U.S. 691, 716 (1987).

---

[6] Sobriety checkpoints and border searches, like TSA screenings, are quintessential administrative searches because their immediate purpose is not "crime control," but to "apprehend[] stolen vehicles" and "reduc[e] the immediate hazard posed by the presence of drunk drivers on the highways," *Edmond*, 531 U.S. at 39, 40; *see generally Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 447 (1990), or to "[i]nterdict[] the flow of illegal entrants." *Martinez-Fuerte*, 428 U.S. at 552. The Court only "tolerate[s] suspension of the Fourth Amendment's warrant or probable-cause requirement" in routine administrative searches like TSA screenings "because there [is] no law enforcement purpose behind the searches in those cases, and there [is] little, if any, entanglement with law enforcement." *Ferguson*, 532 U.S. at 79 n.15. Hence the sharp divide between screeners who conduct preventative searches and TSA "law enforcement officer[s]" to whom screeners are required to "refer" the

13

In sum, screeners can conduct routine, suspicionless searches only for the programmatic purpose of removing prohibited items, which is designed to prevent "violations of Federal law" from occurring; they do not search, and may not constitutionally search, "for violations of Federal law."

*"Seize Evidence" and "Make Arrests."* The other terms in the list ("seize evidence" and "make arrests") provide important context. As the Majority concedes, "make arrests" necessarily carries criminal connotations. *See* Maj. Op. 17. So does "seize evidence."[7] Under the canon *noscitur a sociis*, Congress's listing of "execute searches" alongside "seize evidence" and "make arrests"—three actions routinely listed in tandem to describe police powers, *see, e.g.*, 21 U.S.C. § 878(a)—reinforces that it intended to limit "searches" to

---

continuation of any search that happens to turn up criminal evidence. TSA Mgmt. Directive 100.4 ¶¶ 6.C(1), 6.G(2).

[7] The word "seize" in this context comes directly from the Fourth Amendment, *see* U.S. Const. amend. IV (requiring that a warrant describe the "things to be seized"), and Congress uses the phrase in the criminal context throughout the United States Code, *see, e.g.*, 7 U.S.C. § 2270; 10 U.S.C. §§ 282–283; 16 U.S.C. § 1437; 34 U.S.C. § 21114; *id.* § 30103; 42 U.S.C. § 9153; 49 U.S.C. § 114(p). The Supreme Court also uses the phrase routinely to connote the seizure of evidence in criminal matters. *See, e.g.*, *United States v. Leon*, 468 U.S. 897, 923 n.23 (1984); *Payton v. New York*, 445 U.S. 573, 577 n.5 (1980); *Franks v. Delaware*, 438 U.S. 154, 167 (1978); *Stone v. Powell*, 428 U.S. 465, 489 (1961).

14

those conducted for investigatory, not administrative, purposes.

In a cautionary tale, albeit not heeded by the Majority, the Supreme Court held that a nearby provision in the FTCA barring claims arising out of the "loss, miscarriage, or negligent transmission of letters or postal matter," 28 U.S.C. § 2680(b), did not extend to mail carriers creating slip-and-fall hazards. *Dolan*, 546 U.S. at 483. Although acknowledging that the phrase "negligent transmission" of mail could, "[i]f considered in isolation, . . . embrace a wide range of negligent acts," the Court cautioned that a word "may or may not extend to the outer limits of its definitional possibilities." *Id.* at 486. The other terms specified in the list ("loss" and "miscarriage"), the Court concluded, "limit the reach of transmission."[8] *Id.*

So too in § 2680(h)—just a few subsections later—where the terms "seize evidence" and "make arrests" are properly read in the proviso to "limit the reach," *id.*, of "execute searches."

*Investigative or Law Enforcement Officer.* The very term being defined here—"investigative or law enforcement

---

[8] The Majority balks at applying *noscitur a sociis* to the law enforcement proviso because it contains the disjunctive "or." Maj. Op. 18. But the Supreme Court did not hesitate to use it in *Dolan* and, indeed, has used the canon many times in precisely this way. *See, e.g.*, *McDonnell v. United States*, 136 S. Ct. 2355, 2368–69 (2016) ("question, matter, cause, suit, proceeding, or controversy"); *Yates v. United States*, 135 S. Ct. 1074, 1085–86 (2015) ("record, document, or tangible object"); *Jarecki*, 367 U.S. at 307, 310 ("exploration, discovery, or prospecting").

15

officer"—also naturally evokes criminal law enforcement. *See generally United States v. Stevens*, 559 U.S. 460, 474 (2010) ("[A]n unclear definitional phrase may take meaning from the term to be defined."). The only other statutes found in the United States Code that employ analogous terminology are the Wiretap Act, 18 U.S.C. §§ 2510–2522, 3121–3127, which Congress enacted six years before the law enforcement proviso, and the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. §§ 1809, 1827, which was enacted four years afterward. Both statutes use the term to identify who can lawfully conduct or receive information about wiretaps or electronic surveillance—classic examples of investigatory searches. *See* 18 U.S.C. § 2510(7); 50 U.S.C. §§ 1809, 1827. And notably, in construing "investigative or law enforcement officer" under the Wiretap Act, the Office of Legal Counsel recognized that the powers of an "investigative . . . officer" do not coincide with those of a "law enforcement officer" but that both positions execute criminal law enforcement functions.[9] *See* 14 Op. O.L.C. 107, 108 (1990).

---

[9] The Majority suggests that I render the remainder of the law enforcement proviso a nullity by interpreting "investigative or law enforcement officer" to refer to officers with criminal law authority. *See* Maj. Op. 25. But as the Office of Personnel Management's Occupational Handbook makes clear, numerous investigative officers are not law enforcement officers, *see* OPM, *Handbook of Occupational Groups and Families* 109 (Dec. 2018), and not all investigative officers "execute searches, seize evidence, or make arrests," *compare id.* at 1801, 1810 ("[g]eneral," i.e., administrative investigators), *with id.* at 109 (criminal investigators). Thus,

16

*Intentional Torts Covered.* Finally, the law enforcement proviso waives immunity only for the types of tort claims typically asserted against traditional investigative or law enforcement officers—assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution; it preserves the United States's immunity for libel, slander, misrepresentation, deceit, and interference with contract rights. *See* 28 U.S.C. § 2680(h). The Majority brushes this point off by saying that the specific tort claims in the proviso can be brought against administrative employees like screeners. But that begs the question: Before today's holding, sovereign immunity precluded these intentional tort claims from being brought against any employee of an administrative agency.

Congress's intentional selection of torts premised on use of excessive force and lack of probable cause cannot be waved aside by the observation that screeners, like any other federal employee, can commit "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). The point is that, of those intentional torts for which Congress

---

the proviso's definition of "investigative or law enforcement officer" is necessary to distinguish between investigative officers involved in criminal investigations conducted for violations of federal law and those involved in administrative searches conducted for other purposes. Nor is it unusual for Congress to define "law enforcement officer" by reference to the officer's duties, even if those duties all sound in criminal law. *See, e.g.*, 5 U.S.C. § 8331(20); 12 U.S.C. § 248(q)(4); 18 U.S.C. § 245(c); *id.* § 1515(a)(4).

17

preserved sovereign immunity, it excepted only torts typically associated with traditional police powers for the proviso.

For these reasons, the law enforcement proviso evinces no intent to waive sovereign immunity for administrative searches. And on that basis alone, Pellegrino's FTCA claims do not fall within the proviso.

**B. TSA Screeners Are Not "Officers" Under the Proviso**

The law enforcement proviso further limits the waiver of sovereign immunity to alleged torts committed by "officer[s]." *See* 28 U.S.C. § 2680(h). The FTCA does not define "officer," so the Majority turns to dictionaries. *See* Maj. Op. 9. But any particular dictionary definition of "officer" cannot resolve this question on its own because those definitions run the gamut. *See United States v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012) ("The selection of a particular . . . [dictionary] definition is not obvious and must be defended on some other grounds of suitability."); *see also* Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 Harv. J. L. & Pub. Pol'y 61, 67 (1994) ("[T]he choice among meanings [of words in statutes] must have a footing more solid than a dictionary . . . ."). For every broad definition of "officer" that could possibly cover screeners, *see, e.g.*, *Officer*, Webster's Third New International Dictionary of the English Language 1567 (1971) (one "serv[ing] in a position of trust [or] authority," or one "charged with a duty"), there is a narrower definition requiring far more authority than screeners possess—traditional police authority—that easily could take its place, *see, e.g.*, *Officer*, Webster's New Collegiate Dictionary 797 (1976) ("one charged with police duties"); *Officer*, The Random House

18

Dictionary of the English Language 1000 (1973) ("A policeman or constable.").

Without explanation, the Majority adopts the broadest possible dictionary entries, defining "officer" as someone "'charged' by the Government 'with the power and duty of exercising certain functions,'" Maj. Op. 9 (quoting *Officer*, Black's Law Dictionary 1235 (4th ed. 1968)), or who "serve[s] in a position of trust [or] authority" *id.* (quoting *Officer*, Webster's Third New International Dictionary 1567 (1971)). Such expansive definitions of "officer" could theoretically pass muster if they did no violence to neighboring words in the statute. *See, e.g.*, *United States v. Locke*, 529 U.S. 89, 105 (2000); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991). But here they do.

1. The Majority's Reading Gives No Meaning to Congress's Choice of "Officer," Rather Than "Employee," in the Law Enforcement Proviso

Several provisions in the Federal Tort Claims Act use the term "employee" to identify whose acts or omissions are covered. For example, the FTCA grants federal district courts exclusive jurisdiction over torts "caused by the negligent or wrongful act or omission of any *employee*." 28 U.S.C. § 1346(b)(1) (emphasis added). Similarly, the frequently invoked discretionary function exception, found in the very same statutory section as the law enforcement proviso, reasserts sovereign immunity for "[a]ny claim based upon . . . a discretionary function or duty on the part of . . . *an employee* of the Government." *Id.* § 2680(a) (emphasis added). In stark contrast, the law enforcement proviso refers not to "employees," but to "investigative or law enforcement

19

officers," which it defines as an "*officer* of the United States . . . empowered by law" to perform the enumerated functions. *Id.* § 2680(h) (emphasis added).

Where, as here, Congress uses certain language in one part of a statute but distinct terminology elsewhere, courts should "'presume[]' that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *see, e.g.*, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004). If Congress wanted the proviso to sweep broadly, it could have—just as in the discretionary function exception a few subsections above, *see* 28 U.S.C. § 2680(a)—defined "investigative or law enforcement officer" as any "employee" empowered to execute searches. It did not.

The Majority disregards this presumption by choosing a dictionary definition of "officer" so broad as to render the term coextensive with "employee." Indeed, I am hard pressed to conceive of any employee of an agency who conducts administrative searches and is not, as the Majority defines it, in "a position of trust and authority," or, for that matter, any federal employee at all who has not been "'charged' by the Government 'with the power and duty of exercising certain functions.'" Maj. Op. 9 (citations omitted).

Instead of conflating "officer" with "employee," I read Congress's markedly different language in the very same statutory section to signal an intent to limit the proviso to a specific class of federal government personnel: those "charged with police duties." *Officer*, Webster's New Collegiate Dictionary 797 (1976). After all, the FTCA itself defines "[e]mployee of the government" as "officers or employees *of any federal agency*." 28 U.S.C. § 2671 (emphasis added). And

20

the law enforcement proviso, in using "officer" to define "investigative or law enforcement officer," likewise specifies that such officers be "empowered *by law*"—i.e., the statute or regulation governing that officer's agency—to perform traditional police functions.[10] 28 U.S.C. § 2680(h) (emphasis added). And when we look at the statute "empower[ing]" screeners, the Aviation and Transportation Security Act (ATSA), screeners clearly do not qualify as officers.

> 2. The ATSA Distinguishes Between Screeners and Officers Empowered with Investigative and Law Enforcement Powers

The ATSA specifies that "screening . . . shall be carried out by a Federal Government *employee* (as defined in section 2105 of title 5)." 49 U.S.C. § 44901(a) (emphasis added). This contrasts with 49 U.S.C. § 114(p)(1), which permits the TSA Administrator to "designate" particular TSA employees "to serve as . . . law enforcement officer[s]." Those distinctions between screener "employees" and law enforcement "officers" recur throughout the statute.[11]

---

[10] Notably, the only other exception in the FTCA mentioning "officers" indisputably refers to law enforcement officers. *See* 28 U.S.C. § 2680(c) ("[A]ny officer of customs or excise or any other law enforcement officer . . . ."); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008).

[11] *Compare* 49 U.S.C. § 114(e)(2) (providing that the TSA Administrator is responsible for "hiring and retention of security screening personnel"), *id.* § 44901(a) (explaining that screenings will be performed by an "employee"), *id.*

21

Only TSA employees designated as "officers" are empowered by law to "carry a firearm," "make an arrest," and "seek and execute warrants for arrest or seizure of evidence," *id.* § 114(p)(2)—functions that place them squarely within the proviso. Those law enforcement officers are required to be stationed "at each airport security screening location," *id.* § 44901(h)(1), "to support each system for screening" and perform those functions that TSA screeners have neither the authority nor the expertise to fulfill, 49 C.F.R. § 1542.215(a)(2).

And were there any doubt about whether Congress intended that mapping, the ATSA dispels it: Congress expressly cross-referenced the FTCA when it distinguished the liability of state and local law enforcement officers—who may be deputized by the Administrator to supplement "Federal law enforcement officers" at airports, 49 U.S.C. § 44922—from the liability of "personnel of a qualified private screening

---

§ 44935(e)–(f) (describing training programs, hiring qualifications, and employment standards for "[s]ecurity screeners"), *and id.* § 44936(a) (requiring background investigation of a "security screener"), *with id.* § 114(p) (describing "law enforcement officer[s]"), *id.* § 44901(h)(1) (requiring the deployment of "law enforcement personnel" at screening locations), *id.* § 44903(a) (defining "law enforcement personnel"), *and id.* § 44922 (permitting the TSA Administrator to deputize "state and local law enforcement officers"); *see also* TSA Mgmt. Directive No. 100.4 (separately defining "law enforcement officer" and "transportation security officer").

company"—who may be approved for private contracting by the Administrator to assist airport operators under the Screening Partnership Program, 49 U.S.C. § 44920. On the one hand, a deputized state or local law enforcement officer "shall be treated as a Federal law enforcement officer," *id.* § 44922(b), and is expressly made subject to the FTCA "while carrying out Federal airport security duties within the course and scope of the officer's employment,"[12] *id.* § 44922(e). On the other hand, contracted airport "screening personnel"— who, notably, must be overseen by "Federal Government supervisors . . . and . . . Federal Government law enforcement officers at the airport pursuant to this chapter," *id.* § 44920(e)(1)—are not made subject to the FTCA and instead retain "liability related to [their] own acts of negligence, gross negligence, or intentional wrongdoing," *id.* § 44920(g)(3).

---

[12] In seeking to downplay the significance of the ATSA's explicit cross-reference to the FTCA, with its differential treatment of deputized officers and contracted airport screeners under the proviso, the Majority emphasizes that § 44922(e) designates a deputized officer an "'*employee* of the Government' for purposes of the proviso," Maj. Op. 11. Again, the Majority mistakes meaning for lack of context: Section 44922(e) is using "[e]mployee of the Government" as a term of art, defined in turn in the FTCA not as limited to "employees" but as "officers or employees of any federal agency," 28 U.S.C. § 2671—thus applying the proviso to "officers" and again distinguishing between the terms "officer" and "employee." Congress's intention to cover deputized officers under the proviso but to treat contracted airport screeners (like their TSA counterparts) as regular employees could not be more clear.

Congress could hardly be more explicit that (1) it knew it was legislating in the ATSA against the backdrop of the FTCA; (2) it intended the terms "employee" and "officer" to carry the same meaning in the ATSA and the FTCA; and (3) it intended for the TSA's "law enforcement officers" (whether federally employed or deputized) to be treated as "officers" subject to the proviso, but for "screeners" (whether federally employed or contracted) to be treated as employees who are not. *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019) ("This Court does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes.").

### 3. The Majority's Contrary Arguments Are Unavailing

In the face of the plain text to the contrary, the Majority offers several reasons why its broad interpretation of "officer," which would encompass a screener, should prevail. None is persuasive.

First, the Majority tells us that we should not rely on the distinction between an "officer" and "employee" in the FTCA and ATSA because both statutes define "employee" to include "employees" and "officers," and there can be no "distinction between two terms that are not themselves mutually exclusive." Maj. Op. 11 (citing 28 U.S.C. § 2671; 49 U.S.C. § 44901(a)). But the commonsense proposition that "officers" are still employed by the Government does not detract from the significance of Congress's choosing different words: It distinguished between "officers" and "employees" and made only "officers" subject to the proviso. *See* 28 U.S.C. § 2680(h); 49 U.S.C. § 114(p)(1) (allowing the TSA Administrator to designate a TSA "employee . . . to serve as a law enforcement

24

officer").

Second, the Majority argues against mapping the ATSA's definition of "employee" and "officer" onto the FTCA. But its syllogism is flawed. According to the Majority, (a) because the ATSA defines the term "employee" by reference to the general civil-service laws, *see* 49 U.S.C. § 44901(a) (citing 5 U.S.C. § 2105), the term "officer" in the ATSA must also be defined by reference to the general civil-service laws, 5 U.S.C. § 2104 (defining "officer");[13] (b) using the civil-service definition of "officer" in the FTCA would make the proviso underinclusive because certain officers indisputably covered by the proviso, like postal inspectors, are not "appointed by the head of an Executive agency," Maj. Op. 10 (citing 5 U.S.C. § 2104(a)(1)); *ergo* (c) the FTCA must define "officer" differently than the ATSA.

But both premises are wrong. Congress did not define "officer" in the proviso by reference to civil-service laws; it told us in no uncertain terms to look to the particular "law" that "empower[s]" employees of that agency—here, the ATSA, to act as officers; *see also* 28 U.S.C. § 2671 (defining "[e]mployee of the government" for purposes of the FTCA as

---

[13] At § 44901(a), the ATSA provides that "screening . . . shall be carried out by a Federal Government employee (as defined in section 2105 of title 5)." For its part, the general civil-service laws define "employee" as either an officer or any other individual appointed by another member of the federal government. 5 U.S.C. § 2105(a)(1). They separately define "officer" to refer to individuals who, under the Constitution's Appointments Clause, must be appointed by the President, the head of an executive agency or department, or a court. *See id.* § 2104(a).

25

"officers or employees *of any federal agency*") (emphasis added). Nor did Congress define "officer" in the ATSA by way of cross-reference to the civil-service definition, as it did for the definition of "employee." Instead, the ATSA defines "officer" by virtue of the powers bestowed on those employees. *See* 49 U.S.C. § 114(p). There is no inconsistency in considering the statute and implementing regulations to deduce who is empowered by law to act as an "officer" under the proviso; that is precisely what Congress directed.

With that reading, moreover, the FTCA's reference to "officer" is not "underinclusive." The laws that empower employees of various agencies consistently demarcate those who carry police powers from regular employees. Examples include the Internal Revenue Code, 26 U.S.C. § 7608(a), the statute governing postal inspectors, 18 U.S.C. § 3061(a), and the implementing regulations for the Department of Homeland Security and Drug Enforcement Agency, 8 C.F.R. § 287.5(c)–(e) (DHS); 28 C.F.R. pt. 0, subpt. R, app. § 3 (delegating powers under 21 U.S.C. §§ 878–879). And, as our discussion makes clear, when it comes to those with police powers under the ATSA, the statute clearly and unambiguously distinguishes employees from officers, which TSA screeners are not. *See, e.g.*, 49 U.S.C. § 114(p)(2)(A)–(C).

Third, the Majority relies on the fact that screeners "are officers by name" and "wear uniforms with badges noting that title." Maj. Op. 10. It is surprising indeed that such a superficial gloss is deemed relevant to understanding a waiver of federal sovereign immunity—particularly as these employees were originally called "screeners" (and remain so in the statute and regulations), and TSA (not Congress) changed their name to Transportation Security Officer (TSO) in 2005 only in an effort to improve morale and foster "upward

26

mobility opportunities within [the] profession."[14]  Notably, these changes were intended to "give[] TSOs an opportunity . . . to apply *for DHS law enforcement positions*."  U.S. Gov't Accountability Office, GAO-07-299, Aviation Security 56 (Feb. 2007) (emphasis added)—a nonsensical proposition if screeners were already investigative or law enforcement officers.

Fourth, the Majority seizes on the modifier "any" before "officer" to garner support for its expansive interpretation. But, again, this is text without context.  The argument would carry appeal "only if we stopped reading right there," but "we do not stop there; we do not read statutes in little bites." *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 643 (2006). Whether "use of the word 'any' . . . indicate[s] that Congress intended particular statutory text to sweep broadly . . . necessarily depends on the statutory context." *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 629 (2018).  The definition of "investigative or law enforcement officer" does not end after the words "any officer of the United States"; it goes on to delineate those officers "empowered by law to" perform the traditional police powers that follow.  28 U.S.C. § 2680(h).  TSA screeners are not.

---

[14] *The Transportation Security Administration's Airline Passenger and Baggage Screening: Hearing Before the S. Comm. on Commerce, Sci., & Transp.*, 109th Cong. 7 (2006) (statement of Edmund "Kip" Hawley, Assistant Sec'y, TSA); *see* Press Release, TSA, *Transportation Security Officers Have Renewed Focus and New Look on Seventh Anniversary of 9/11* (Sept. 11, 2008), https://www.tsa.gov/news/releases/2008/09/11/transportation-security-officers-have-renewed-focus-and-new-look-seventh.

Finally, relying on *Millbrook v. United States*, 569 U.S. 50 (2013), the Majority contends that the Supreme Court has cautioned against a "cramped reading of the proviso." Maj. Op. 12 (citing *Millbrook*, 569 U.S. at 56–57). But *Millbrook* had nothing to do with who qualifies as an "officer" under the proviso; it held only that the scope of liability for those who did qualify as "officers" was not limited to the acts of "executing a search, seizing evidence, or making an arrest." 569 U.S. at 56. In other words, *Millbrook* concerned only "the acts for which immunity is waived," not, as here, "the class of persons whose acts may give rise to an actionable FTCA claim." *Id.*

In sum, screeners are not "officers" and for that reason, too, they are not "investigative or law enforcement officers."

## II. The Legislative History Confirms That Congress Did Not Intend to Cover Administrative Searches

While legislative history cannot manufacture ambiguity where none exists, "for those of us who use legislative history to help interpret statutes, the history . . . supports our reading," *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1037 (2019), confirming the textual cues on which I rely. The Supreme Court and our Circuit have similarly considered legislative history as a useful "cross-check." *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 95 (3d Cir. 2018) (Ambro, J.); *see, e.g.*, *Sturgeon v. Frost*, 139 S. Ct. 1066, 1085 (2019).

Congress did not come to use the word "officer" rather than "employee" in the proviso by accident. Responding to two appalling "no-knock" raids by federal narcotics officers, Congress considered three bills to amend the broad immunity

preserved by the intentional tort exception, with Members referring regularly to the other bills as each was debated. Jack Boger et al., *The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis*, 54 N.C. L. Rev. 497, 510–17 (1976). Two of the bills waived sovereign immunity for the specified intentional torts for *all* federal employees. *Id.* But Congress enacted a third bill (the "Proviso Bill") that limited the waiver of immunity to "investigative or law enforcement officers." *See* Act of March 16, 1974, Pub. L. No. 93-253, 88 Stat. 50 (codified at 28 U.S.C. § 2680(h)).

In its deliberations, policymakers discussed the fact that the Proviso Bill, unlike the other bills, would not cover federal employees who perform administrative searches. Some observed that the Proviso Bill "only applies to law enforcement officers. It does not apply to any other Federal employees that might violate the rights of an individual." 120 Cong. Rec. 5287 (statements of Reps. Donohue and Wiggins). Others, urging passage of the alternative bills that waived immunity for all federal employees, lamented that the Proviso Bill would provide no remedy for assaults committed by those who perform administrative searches: "We have Department of Agriculture investigators who go [in to] look at books and records. We have Defense Department auditors to look at books and records. . . . They are not law enforcement officers even under this definition. They don't qualify."[15] But the

---

[15] *Federal Tort Claims Amendments: Hearings on H.R. 10439 Before the Subcomm. on Claims and Governmental Relations of the H. Comm. on the Judiciary*, 93d Cong. 18 (1974) [hereinafter H.R. 10439 Hearings] (testimony of Irving Jaffe, Acting Assistant Att'y Gen.); *see also id.* at 15

Proviso Bill carried the day.

The legislative history concerning the particular torts selected for the proviso also confirms my plain text reading: Congress's intention, in excepting "assault, battery, false imprisonment, false arrest, abuse of process, [and] malicious prosecution," 28 U.S.C. § 2680(h), from the broader list of immunized torts was to cover "the types of tort[s] most frequently arising out of activities of Federal law enforcement officers." H.R. 10439 Hearings at 14 (statement of Jaffe); *see also* 119 Cong. Rec. 33,496 (1973) (giving verbatim explanation in reference to S. 2558).

This history simply corroborates what the text itself conveys: After debating competing options, Congress decided to afford a remedy only to "victims of Federal law enforcement abuses." *Caban v. United States*, 671 F.2d 1230, 1235 (2d Cir. 1982) (quoting S. Rep. No. 93-588, at 4 (1973)); *see Carlson v. Green*, 446 U.S. 14, 19 (1980) ("Congress amended FTCA in 1974 to create a cause of action against the United States for intentional torts committed by federal law enforcement officers.").

---

(testimony of Irving Jaffe) ("It should be noted that . . . H.R. 8245 is confined in its applicability to Federal investigative or law enforcement officers, while . . . H.R. 10439 would waive the sovereign immunity of the United States as to the same acts or omissions on the part of all Government employees.").

### III. The Majority's Approach Waives Sovereign Immunity for All Employees Who Conduct Administrative Searches

After dismissing "[a]ttempts to distinguish . . . between administrative and criminal 'searches'" as purportedly "divorced from the plain text," the Majority offers up an atextual reading, positing that a distinction could be drawn between physical and nonphysical searches. Maj. Op. 14, 20. But the Majority provides no principled basis for that distinction. That is because there is not one: Its reading sweeps in all administrative searches.

#### A. The Majority Offers No Principled Basis for Limiting Its Reading to Physical Searches

Uneasy with the breadth of its holding, the Majority posits that TSA screenings can be distinguished from other administrative searches because they may include pat-downs. For an opinion premised on adhering to the text's plain meaning, this marks a striking shift. Nothing in the proviso even remotely hints at a distinction between administrative searches that include pat-downs and administrative searches that do not. It does not use the term "physical searches," but simply "searches." My colleagues cannot in the same breath proclaim fidelity to the text and devise an atextual line between "physical searches" and "non-physical searches" to attempt to cabin the proviso's reach: Congress either intended the proviso to waive sovereign immunity for those conducting both categories of Fourth Amendment "searches"—investigatory and administrative—or it did not.

Not only is this reading of the proviso as limited to "physical searches" atextual, it is made out of whole cloth. The

31

Supreme Court has never distinguished between administrative searches that include pat-downs and other administrative searches. To the contrary, it has treated administrative searches that include physical searches—such as drug screenings, searches at the entrances of certain government buildings, airport screenings, border inspections, and sobriety checkpoints—like any other kind of administrative search. *Edmond*, 531 U.S. at 39, 41–42, 47–48. The distinction the Court has drawn is not between physical and non-physical searches, but between administrative searches for "programmatic purposes" and investigatory searches to "uncover evidence of ordinary criminal wrongdoing." *Id.* at 42, 45–46; *see supra* at 4–9.

The Majority also suggests that its expansion of the proviso today is limited only to TSA screenings because "they extend to the general public and involve examinations, often intrusive, of an individual's physical person along with her property." Maj. Op. 22. But those features are not unique to airport searches. Searches to which the general public is subjected involving examinations of persons and property are "now routine . . . at entrances to courts and other official buildings." *Chandler*, 520 U.S. at 323. They are "used widely at state and local levels to enforce laws regarding drivers' licenses, safety requirements, weight limits, and similar matters." *Martinez-Fuerte*, 428 U.S. at 560 n.14. All federal agencies "may, at their discretion, inspect packages, briefcases and other containers in the immediate possession of . . . persons arriving on, working at, visiting, or departing from Federal property." 41 C.F.R. § 102-74.370. And regulations also authorize such searches, including pat-downs, at cruise-ship terminals, 33 C.F.R. § 105.290, prison visitor entrances, 28 C.F.R. § 543.13(f), chemical facilities, 6 C.F.R.

32

§ 27.230(a)(3), and nuclear sites, 10 C.F.R. § 73.46(d)(4)(i). We cannot pluck TSA screenings from Pandora's box without casting it open.

Finally, the Majority errs in conflating airport pat-downs with *Terry* stops. Airport pat-downs serve a programmatic purpose; *Terry* stops require individualized suspicion. We made that point clearly in *Hartwell*, where we upheld a frisk "without individualized suspicion" of an airport passenger as "permissible under the administrative search doctrine." 436 F.3d at 181. *Hartwell* further observed that, unlike *Terry* stops, airport screenings are "well-tailored to protect personal privacy," lack virtually any stigma, provide passengers with advance notice, and are "made under supervision and not far from the scrutiny of the traveling public." *Id.* at 180–81 (citation omitted). *Terry* stops are on the other side of that Fourth Amendment divide: They require a "reasonable belief" that "criminal activity may be afoot." 392 U.S. at 28, 30.

In the end, the Majority succumbs to the siren call that we need only concern ourselves today with "hold[ing] . . . that TSO screenings are 'searches' under the proviso," leaving future panels to fend off the consequences. Maj. Op. 22. But we should not undertake even a purportedly narrow holding—and the Majority's holding is far from narrow—without having both a principled basis and a considered view of the repercussions. The Majority's inability to identify any sustainable distinction between TSA screenings and other administrative searches does not bode well for either.

**B. The Majority's Approach Would Naturally Result in the Waiver of Sovereign Immunity for All Employees Who Perform Administrative Searches**

Without a limiting principle, the Majority's interpretation of the law enforcement proviso works a staggering expansion of the Government's waiver of sovereign immunity. Much of what administrative agencies and their employees are empowered to do qualifies as a "search" under the Fourth Amendment. Several agencies routinely perform audit examinations. *See, e.g.*, 12 U.S.C. § 483 (Federal Reserve); 17 C.F.R. § 1.31(d)(1) (CFTC). Nearly all agencies exercise the subpoena power to inspect the books and records of regulated or contracting parties. *See, e.g.*, 41 U.S.C. § 4706 (Defense Contract Audit Agency); 29 U.S.C. § 209 (DOL); *id.* § 161 (NLRB); *see also Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (noting that administrative subpoenas constitute "searches" under the Fourth Amendment). Many agencies also employ personnel to physically inspect commercial premises for security, health, and safety violations: The Department of Defense scrutinizes defense contractors, *see, e.g.*, 10 U.S.C. § 2313(a), the FDA inspects meatpackers, 21 U.S.C. § 606(a), and the EPA surveys hazardous waste sites, 42 U.S.C. § 6927(a). Even examinations of employees' workspaces and drug tests constitute searches under the Fourth Amendment. *See, e.g.*, *Skinner*, 489 U.S. at 616–17 (drug test); *O'Connor*, 480 U.S. at 717 (workspaces).

Here, the significance of the Supreme Court's decision in *Millbrook v. United States*, 569 U.S. 50 (2013), warrants emphasis. Under *Millbrook*, if an employee has the authority to perform any of these "searches"—and thus, under the Majority's interpretation, qualifies as an "investigative or law

34

enforcement officer"—it matters not whether an enumerated intentional tort occurred during a search, seizure, or arrest. *See id.* at 57. The United States will be liable for any of the intentional torts committed by that employee *at any point* in the scope of her employment. *Id.* By my colleagues' reading, that includes any employee with authority to issue an administrative subpoena, inspect premises, conduct an audit, or administer a drug test.

The potential scale of that liability is why Congress sought to limit the proviso to "investigative or law enforcement officers" and the specific subset of intentional torts they are carefully trained to avoid. Law enforcement officers "are expected to 'schoo[l] themselves in the niceties'" of Fourth Amendment doctrine, applying some practical limit to the proviso's waiver of immunity. *O'Connor*, 480 U.S. at 724 (alteration in original) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 343 (1985)); *see, e.g.*, 8 C.F.R. § 287.5(b)–(c) (DHS). But "no such expectation is generally applicable to public employers, at least when the search is not used to gather evidence of a criminal offense."[16] *Id.*

---

[16] TSA screeners are a case in point. While undoubtedly performing an important job in furtherance of our nation's security, screeners neither are law enforcement officers nor are "trained on issues of probable cause, reasonable suspicion, and other constitutional doctrines that govern law enforcement officers." *Vanderklok v. United States*, 868 F.3d 189, 208 (3d Cir. 2017). TSA law enforcement officers must complete standard law enforcement training prescribed by the state, including training in the use of firearms and in "treatment of persons subject to inspection, detention, search, arrest, and

In short, instead of drawing the principled and constitutionally grounded line between investigatory and administrative searches, my colleagues today open the United States Treasury to liability for the intentional torts of *every* federal employee with the authority to conduct *any* Fourth Amendment search—regardless of the employee's knowledge of, or training in, Fourth Amendment doctrine. In my view, Congress chose its words in the proviso carefully to avoid this very result.

## IV. The Majority Creates, and Takes the Wrong Side of, a Circuit Split

If, as the Majority claims, its reading reflected an intuitive reading of the law enforcement proviso, presumably it would find some support in our precedent or that of other circuits. But instead it marks a dramatic departure.

Among our precedents, the Majority's approach is in sharp tension with *Matsko v. United States*, 372 F.3d 556 (3d Cir. 2004), where we held that a Mine Safety and Health Administration employee with "authority to inspect mines and investigate possible violations" was not covered by the proviso, because "employees of administrative agencies, no matter what investigative conduct they are involved in, do not

---

other aviation security activities." 49 C.F.R. § 1542.217(c). Screeners, by contrast, must "possess a high school diploma" or "sufficient[ly]" relevant experience and have "basic aptitudes and physical abilities, including color perception, visual and aural acuity, physical coordination, and motor skills" as well as "sufficient dexterity and capability" to "perform pat-downs or hand-held metal detector searches." *Id.* § 44935(f).

come within the § 2680(h) exception." *Id.* at 560. Without explaining how it distinguishes TSA screeners from such inspectors, the Majority leaves *Matsko* in limbo, purporting to leave its holding intact while declaring its rationale "no longer valid." Maj. Op. 21. Of course, the en banc court may jettison our precedent, but a survey of other circuits' precedent reveals that *Matsko* is no outlier.

A unanimous panel of the Eleventh Circuit squarely rejected the Majority's interpretation in a persuasive and well-reasoned, albeit non-precedential,[17] opinion. *See Corbett v. TSA*, 568 F. App'x 690 (11th Cir. 2014) (per curiam). The court there considered the pertinent statutory language and concluded that TSA screeners are not covered by the proviso for the "simple[]" reason that they are "employees," not "officers." *Id.* at 701. The court therefore relied on the same textual distinction that the Majority in this case elides.[18]

---

[17] Unpublished opinions of the Eleventh Circuit, while not binding on that court, "may be cited as persuasive authority." 11th Cir. R. 36-2.

[18] Most district courts have reached the same conclusion as *Corbett*. *Compare, e.g.*, *Hernandez v. United States*, 34 F. Supp. 3d 1168, 1182 (D. Colo. 2014) (holding that the proviso does not cover TSA screeners), *Weinraub v. United States*, 927 F. Supp. 2d 258, 266 (E.D.N.C. 2012) (same), *and Coulter v. U.S. Dep't of Homeland Sec.*, No. 07-4894, 2008 WL 4416454, at *9 (D.N.J. Sept. 24, 2008) (same), *with Armato v. Doe 1*, No. CV-11-02462-PHX-ROS, 2012 WL 13027047, at *4 (D. Ariz. May 15, 2012) (holding that the proviso covers TSA screeners).

Along those same lines, other Courts of Appeals have consistently treated only those performing traditional law enforcement duties as "investigative or law enforcement officers" under the proviso. For example, the D.C. Circuit has concluded that postal inspectors, who are empowered to investigate criminal matters, *see* 18 U.S.C. § 3061, are covered by the proviso. *See Moore v. United States*, 213 F.3d 705, 708–10 (D.C. Cir. 2000). Courts have also ruled that the proviso covers customs officers, *see Nurse v. United States*, 226 F.3d 996, 1002–03 (9th Cir. 2000), Veterans' Administration (VA) police officers, *see Celestine v. United States*, 841 F.2d 851, 852–53 (8th Cir. 1988) (per curiam), U.S. Marshals, *see Hoston v. Silbert*, 681 F.2d 876, 879 (D.C. Cir. 1982) (per curiam), ICE agents, *see Caban*, 671 F.2d at 1234, FBI agents, *see Brown v. United States*, 653 F.2d 196, 198 (5th Cir. Unit A 1981), and federal correctional officers, *see Hernandez v. Lattimore*, 612 F.2d 61, 64 n.7 (2d Cir. 1979). Each of those positions participates in traditional law enforcement.[19]

Consistent with these decisions, the Seventh Circuit held in *Bunch v. United States*, 880 F.3d 938 (7th Cir. 2018), that the limited record "d[id] not foreclose the possibility" that the proviso could apply to an ATF forensic chemist whose duties may have included "the identification of relevant

[19] While ICE agents have some civil responsibilities, they are also empowered "to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens." 8 U.S.C. § 1357(a)(4). Likewise, Bureau of Prisons officers are entitled to carry firearms and make arrests for violations of federal law, *see* 18 U.S.C. § 3050, as are customs officers, *see* 19 U.S.C. § 1589a.

evidence for colleagues during *crime-scene investigations*." *Id.* at 943, 945 (emphasis added). To be sure, *Bunch* held that "executing searches" under the proviso was not limited to executing search warrants. *Id.* at 945. But the Seventh Circuit emphasized that the forensic chemist may have had the authority under Title 18, the federal criminal code, "to inspect the site of any accident, or fire, in which there is reason to believe that explosive materials were involved," *id.* at 943 (quoting 18 U.S.C. § 846 (1994)), and offered, as other examples of the types of searches covered by the proviso, searches incident to arrest, protective sweeps, and searches conducted pursuant to the automobile exception, *id.* at 945— all of which are executed by traditional law enforcement officers.

On the other hand, other circuits have held that the proviso does not cover positions that lack a criminal law component. In *EEOC v. First National Bank of Jackson*, for example, the Fifth Circuit concluded that EEOC agents fell outside the proviso, distinguishing between federal employees who "have access to, for the purpose of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices," and "investigative or law enforcement officers" who have the power to "execute searches." 614 F.2d 1004, 1007–08 (5th Cir. 1980) (citation omitted); s*ee also Wilson v. United States*, 959 F.2d 12, 15 (2d Cir. 1992) (per curiam) (parole officers); *Moore*, 213 F.3d at 710 (federal prosecutors); *Solomon v. United States*, 559 F.2d 309, 310 (5th Cir. 1977) (per curiam) (security guards); *Johnson v. United States*, 547 F.2d 688, 691 (D.C. Cir. 1976) (per curiam) (VA hospital physicians).

In short, with no exception until today, the Courts of

39

Appeals have consistently interpreted the proviso to distinguish between federal officers involved in traditional law enforcement and federal employees who are not. We should not be creating this circuit split, much less putting ourselves on the wrong side of it.

**V.** **Where, as Here, At Least Two Plausible Interpretations Exist, We Must Construe the Law Enforcement Proviso in Favor of the Sovereign**

By departing from precedent to expose the United States to enormous liability, the Majority's interpretation runs afoul of another principle of statutory interpretation: that waivers of sovereign immunity must be construed narrowly in favor of the United States.

Because courts do not casually infer that the United States has waived its sovereign immunity, a waiver must be "strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996). Thus, where "a plausible interpretation of the statute" exists that would preserve the United States's sovereign immunity, a court must adopt it. *Cooper*, 566 U.S. at 290–91. Our Circuit, just like every other, has applied these principles to the FTCA's waiver of immunity. *Lightfoot v. United States*, 564 F.3d 625, 628 (3d Cir. 2009); *see also Evans v. United State*s, 876 F.3d 375, 380 (1st Cir. 2017); *Tsolmon v. United States*, 841 F.3d 378, 382 (5th Cir. 2016); *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016); *Lopez v. United States*, 823 F.3d 970, 976 (10th Cir. 2016); *Jackson v. United States*, 751 F.3d 712, 717 (6th Cir. 2014).

While *Dolan* held that the general rule does not adhere

when interpreting an exception to the FTCA, i.e., when the United States *reclaims* its sovereign immunity,[20] *see* 546 U.S. at 491–92, we consider here an exception to an exception. Having restored the baseline of sovereign immunity for intentional torts, Congress carved out an exception in the proviso—that is, a waiver once more. And faced with a waiver of sovereign immunity, we must revert to the general rule of strict construction applicable to waivers of immunity. *See Foster v. United States*, 522 F.3d 1071, 1079 (9th Cir. 2008) (applying this analysis). Under that rule, the Majority cannot seriously argue that the original *Pellegrino* panel majority, the four dissenters here, and the unanimous panel in *Corbett*—not to mention the unanimous panel in *Matsko*—all adopted an *"implausible"* view of the law enforcement proviso. Nor would I suggest as much of my colleagues in the Majority. But there's the rub: A "waiver of sovereign immunity must extend unambiguously," *Lane*, 518 U.S. at 192, such that no "plausible interpretation of the statute" exists under which the United States would remain immune from suit, *Cooper*, 566 U.S. at 290–91. Our reasonable disagreement makes one thing clear: There is ambiguity in the scope of the proviso. In these circumstances, we may not impute to Congress so significant a waiver of sovereign immunity.

*     *     *

Like my colleagues, I am sympathetic to the concern that the current legal regime provides no obvious remedy for

---

[20] Even then, *Dolan* tasked us with "identify[ing] those circumstances which are within the words and reason of the exception—no less and no more," 546 U.S. at 492 (internal quotation marks and citation omitted)—not with interpreting the exception against the sovereign.

41

torts committed by TSA screeners.  For most, TSA screenings are an unavoidable feature of flying, *see* 49 U.S.C. § 44901(a), and, like all government functions, screenings carry a risk of abuse.  For these reasons, Congress may well see fit to expand the law enforcement proviso or otherwise provide recourse for passengers seeking to assert intentional tort claims against screeners.

But courts "do not sit as councils of revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy."  *United States v. Rutherford*, 442 U.S. 544, 555 (1979).  Congress to date has limited the proviso to "investigative or law enforcement officers"—a term that covers only officers with traditional police powers.  The wisdom of this policy, especially as it implicates the public fisc, lies beyond our purview.  I therefore respectfully dissent.